UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | | |
|---|---|---|
| NEW YORK COALITION TO SAVE THE STEAM SHIP UNITED STATES, INC. | * * * | |
| *Plaintiff*, | * * | CASE NUMBER: 3:25-cv-212 |
| v. | * * | |
| OKALOOSA COUNTY, FLORIDA, | * * | |
| *Defendant*. | * * | |

# CIVIL COMPLAINT

NOW COMES Plaintiff, NEW YORK COALITION TO SAVE THE STEAM SHIP UNITED STATES, INC., a/k/a NEW YORK COALITION TO SAVE THE SS UNITED STATES, INC., which hereby files its Complaint against OKALOOSA COUNTY, FLORIDA, seeking only transient equitable relief as appears more fully herein, and alleging the following:

## PARTIES

1. Plaintiff (hereinafter, the "Coalition") is a not-for-profit corporation duly formed under the laws of the State of New York on or about October 28, 2024, for the purpose of preventing the SS UNITED STATES, an American-built steamship of inestimable historic value, from being sunk, dismembered, or destroyed.

2. Defendant (hereinafter, the "Defendant" or the "County") is a political subdivision of the State of Florida existing by virtue of Article VIII, Section 1(a) of the Florida Constitution. Defendant currently holds title to SS UNITED STATES.

3. SS UNITED STATES, a/k/a STEAM SHIP UNITED STATES (hereinafter, "SSUS"

or the "Ship"), although not a party *in rem* as pleaded herein, is nonetheless the sole individual beneficiary of this action in equity. Given that the doctrine of personification of a vessel remains a part of the general maritime law of the United States, the status of SSUS as the beneficiary of this action should be recognized and credited by this Honorable Court.

## JURISDICTION

4. This Court has subject-matter jurisdiction under Article III of the Constitution of the United States. In that this action concerns the fate of a vessel in navigation upon navigable waters of the United States, such jurisdiction is provided statutorily by 28 U.S.C. § 1333. Given further that this action concerns the interaction among the three branches of government of the United States in relation to the fate of SSUS, as more fully appears herein, such jurisdiction is further provided statutorily by 28 U.S.C. § 1331.

5. This Court has personal jurisdiction over the Defendant, and venue is proper, because Defendant exists and resides wholly within the District.

## SUMMARY OF THE ACTION AND PLAINTIFF'S CLAIMED BASIS FOR STANDING

6. The sole purpose of this action is to provide the Executive Branch of the United States reasonable time to decide whether SSUS should be taken for public use, with just compensation paid to the County, rather than allowing the Ship, which is due to arrive shortly in a shipyard in Alabama, to be irrevocably cut apart, dismembered, and sunk as an artificial reef in the waters of the Gulf.

7. On or about February 10, 2025, the Coalition wrote, sent, and disseminated an open letter to the President of the United States urging that SSUS be taken for public use. That letter (hereinafter, the "Letter") was sent to the White House by multiple means, including via postal

mail, email, and in raw text form through the White House website. The Letter has appeared and been replicated on social media, and has begun to appear in some online news media.[1]

8. A true copy of the Letter is annexed hereto as **Exhibit 1** and its content is incorporated herein by reference.

9. The Coalition has no means of knowing whether the Executive Branch of the United States is even aware of the Letter, let alone whether it is being considered.

10. Meanwhile, the Ship is due to arrive at a shipyard in Alabama very soon, where she will undergo extensive preparation, including the removal of many of the materials aboard her that would present hazards to marine life, to the marine environment, and potentially even to human life to those who would engage in eco-tourism by visiting her remains underwater.

11. In addition to the above-described measures, the twin stacks of SSUS will be removed, as will other parts of her superstructure. Once this is done, any hope of preserving the Ship afloat and intact will be lost forever.

12. It is estimated that the work in the Alabama shipyard (which is being done at the direction of and under the control of Defendant in preparing SSUS to be towed offshore and sunk by blasting the hull open with explosives) will take approximately one year.

13. The relief sought herein need not delay any work other than that described in the foregoing paragraph 11, and even that work need not be substantially delayed because only a relatively short and eminently reasonable delay of that work is being requested, as more fully appears herein.

14. Plaintiff's claimed basis for standing to bring this action in equity arises out of the

---

[1] *See, e.g.*, "New York preservationists beg Trump to save SS United States," *Axios Philadelphia* (https://www.axios.com/local/philadelphia/2025/02/12/ss-united-states-save-effort-trump-new-york-coalition); "Trump asked to save historic liner SS United States now heading to Mobile for dismantling, sinking," *1819 News* (https://1819news.com/news/item/trump-asked-to-save-historic-liner-ss-united-states-now-heading-to-mobile-for-dismantling-and-sinking).

following facts: (a) the Coalition was formed for the express purpose of saving SSUS after certain events, which will be more fully described herein, had led to a crisis that quickly resulted in the Ship's prior owner's decision to sell the Ship to Defendant to be dismembered and sunk; and (b) the Coalition (apparently uniquely among all concerned organizations) has directly petitioned the Executive Branch of the United States to act, as described in paragraph 7, above.

15. Although the Coalition also has concerns about potential harm to the marine environment (see fourth paragraph of the Letter) notwithstanding the planned attempts at remediation described in paragraph 10, above, Plaintiff does not claim standing on that basis.

## SS UNITED STATES: PAST, PRESENT, AND (POSSIBLE) FUTURE

16. SS UNITED STATES has been described as the flagship of the American merchant marine. Built over the period 1943 to 1951 and launched in 1952, she remains the largest passenger ship ever built in the United States. She was designed to be a luxury ocean liner in peacetime that could switch to wartime transport of up to 14,000 troops if needed. The Ship broke the trans-Atlantic speed record (which she still holds) on her maiden voyage, crossing eastbound in three days, 10 hours and 40 minutes at an average speed of more than 35 knots without even using her full propulsion capacity. During her approximately 800 trans-Atlantic crossings, she carried four U.S. presidents as passengers, and was retired from active use in 1969 after commercial and private air carriage had usurped ocean liners as the preferred, faster means of intercontinental travel.

17. In order to assist the Court, opposing counsel, the Executive Branch of the United States, and other interested actual and potential stakeholders as well as the public at large, a true copy of a document, the Historic American Engineering Record for SS UNITED STATES ("HAER") (National Park Service, U.S. Department of the Interior, Pub. No. PA-647), is

annexed hereto as **Exhibit 2** and its contents are incorporated herein by reference. The same document may be retrieved online directly from a United States government website at the url: https://tile.loc.gov/storage-services/master/pnp/habshaer/pa/pa4100/pa4126/data/pa4126data.pdf.

18. The S.S. United States Conservancy (hereinafter, the "Conservancy"), a non-profit organization incorporated in Washington, DC, which is not a party to this action, purchased the Ship in or about 2011 from her then-owner, Norwegian Cruise Lines.

19. At the time of that purchase, the Ship was berthed at Pier 82 in Philadelphia, where she remained until February 19, 2025.

20. As more fully appears herein, events that arose out of a dispute under the Ship's berthing agreement led to a crisis that quickly resulted in the Conservancy's decision to sell the Ship to the County to be sunk as an artificial reef.[2] As this Complaint is being filed, SSUS has nearly finished crossing the Gulf under tow, and her arrival at the Alabama shipyard is imminent.

21. Were the United States to take SSUS for public use, as the Coalition has urged, long-extant possibilities for preservation and restoration of the Ship, which have unfortunately never been brought to fruition by private interests, could be realized.

22. The timing of what appears to be the imminent destruction of SSUS is especially ironic given that a bill, the Shipbuilding and Harbor Infrastructure for Prosperity and Security (SHIPS) for America Act, was introduced in both the Senate and the House of Representatives in late 2024. This "comprehensive legislation [is intended] to revitalize the United States shipbuilding and commercial maritime industries."[3] Were the United States to take SSUS for

---

[2] A *New York Times* article dated Feb. 19, 2025 (the day the Ship left Philadelphia) notes: "If they had been given more time to find a new home for the ship, leaders of the conservancy said, the outcome might have been different. But a federal court ordered the ship evicted from the Philadelphia pier last summer, following a long legal battle between the conservancy and its landlord. That began a race against the clock to find a temporary or permanent new location . . ." See https://www.nytimes.com/2025/02/19/us/ss-united-states-final-voyage.html.

[3] https://www.kelly.senate.gov/newsroom/press-releases/sen-kelly-sen-young-rep-garamendi-rep-kelly-introduce-ships-for-america-act-to-revitalize-us-shipbuilding-and-commercial-maritime-industries/

public use, as the Coalition has urged, the Ship could serve both as a national historic site and as a valuable educational resource to interest, educate, and inspire future generations of potential naval architects and marine engineers in pursuing such career paths by showing them firsthand a masterpiece of American innovation and achievement in ship design and construction, thereby helping to inspire future innovations and achievements in those fields in the United States.

## **THE CRISIS THAT LED TO THE PRESENT SITUATION**

23. As noted above at paragraph 19, the Ship remained in Philadelphia after the Conservancy (defined at paragraph 18, above) purchased her in 2011. In fact, SSUS sat at Pier 82 in Philadelphia for approximately thirty years, roughly half of which was before the Conservancy acquired her.

24. Upon purchasing the Ship, the Conservancy, on or about June 15, 2011, entered into an agreement for berthing services with Penn Warehousing & Distribution Inc. ("PWD"), which leases the pier from the Philadelphia Regional Port Authority.

25. The aforementioned agreement, a two-page document entitled "Continuation of Berthing Services for S.S. United States" (hereinafter, the "Berthing Agreement"), provided that the Conservancy would pay PWD $850.00 per day to berth SSUS there.

26. After it acquired the Ship in 2011, the Conservancy worked with potential developers to plan to refurbish the Ship and/or to develop her as a permanently moored fixture at some other location where she could serve as a hotel, condominiums, or a multi-purpose venue. The Conservancy covered its monthly carrying costs of $50,000-$60,000 (berthing plus other expenses) through a combination of donations and income from exclusive option agreements with potential developers.

27. In or about 2021, PWD apparently came to view the Ship's continued presence at Pier

82 to be detrimental to its interests. It decided to force the issue to get the ship off the dock by doubling the daily berthing charge, from $850 to $1,700, effective August 24, 2021.

28. The Conservancy paid the daily rate of $1,700 for a month or two, but thereafter re-adjusted its payments back to the original rate and continued to make payment at the daily rate of $850.

29. In a letter dated March 11, 2022, PWD notified the Conservancy that "the tenancy of [the Conservancy] at the Port of Philadelphia, Pier 82 is terminated as of March 26, 2022." PWD sought payment for the alleged unpaid dockage fees and demanded that the Conservancy "move the Vessel by March 26, 2022." The Conservancy did not do so, and on March 28, 2022, PWD filed a lawsuit in Pennsylvania state court against the Conservancy for money damages and ejectment. That action was removed by the Conservancy to the United States District Court for the Eastern District of Pennsylvania, where it proceeded to trial and final resolution.

30. A true copy of the June 14, 2024, Memorandum Opinion by the Honorable Anita B. Brody, United States District Judge (hereinafter, the "Brody Opinion"), is annexed hereto as **Exhibit 3** and its contents are incorporated herein by reference.[4]

31. While Plaintiff does not allege, contend, or suggest that the Brody Opinion contained error, the deadline imposed thereby (see Brody Opinion at 14: "As a matter of equity, I will toll the effective date of the termination through this period of litigation. The effective date of the termination, by which date the Conservancy must remove the Ship from Pier 82, will be 90 days from the date of this decision.") undeniably created nothing short of a crisis for the Conservancy, which needed to find, within three *months*, a place to berth (or a means to dispose of) a nearly-1,000-foot-long vessel that had been at the same berth for three *decades*. *Cf. New York Times*

---

[4]The allegations set forth in paragraphs 24-29 herein are taken substantially from the recitation of facts in the Brody Opinion. The quoted language at paragraph 29 is taken from page 5 thereof.

reporting as set forth at footnote 2 on page 5 above.[5]

32. On August 27, 2024, some 74 days into the 90-day period imposed by the Brody Opinion, the Conservancy and the County entered into a purchase-and-sale agreement (hereinafter, the "Contract of Sale") to sell the Ship to the County. A true copy of the Contract of Sale is annexed hereto as **Exhibit 4**.[6]

33. Title to the Ship was subsequently transferred to the County.

### THE ROLES OF THE POLITICAL BRANCHES IN RELATION TO THE SHIP

34. As explained in paragraph 31, above, the federal judiciary played a role, albeit justly and justifiably, in necessitating the speedy removal of the Ship from the berth she had occupied for some 30 years, which in turn resulted in its sale to Defendant for use as an artificial reef. The Court, in rendering its decision, correctly considered only the interests of the parties to the litigation and not those of the American people as regards the future of the Ship.

35. Given that SSUS is not just *any* vessel, but a unique one that has great cultural and historical significance to the nation that shares its name, the political branches of our government (or at least the one more capable of taking prompt action, i.e., the Executive) should be given at least some opportunity to weigh in before the Ship is irrevocably physically altered such that any hope of her continuing her existence intact and afloat is lost forever. (*Cf.* paragraph 11, above.)

36. Congress, for its part, has spoken twice with regard to the possibility of the United States taking SSUS for public use, but both such pronouncements were during the 1970s and

---

[5] Whether the Conservancy could indeed have found such berthing nearby in the northeastern United States—and even in the Ship's historic home port of New York City—has, given subsequent events, become an academic question, although the Coalition has already indicated that such appears to have been possible (see final sentence in second paragraph of Exhibit 1 (Letter)).

[6] The same document may be retrieved online directly from a County website at the url: https://okaloosacountyfl.iqm2.com/Citizens/FileOpen.aspx?Type=4&ID=44708&highlightTerms=ssus.

neither was meant to address the precise situation at hand today. Nevertheless, as the Coalition wrote to the President in its Letter (Exhibit 1 hereto):

> Public Laws 92-296 and 94-536, taken together, authorize the United States to take the vessel for pubic use, paying just compensation to her owner. The more recent statute widens the scope of potential public use beyond the earlier one's "for operation under the American flag."

True copies of the aforementioned public laws are annexed hereto as **Exhibit 5**.

37. Public Law 94-536, enacted in 1976, widens the scope of potential public use to include "for use as a floating hotel in or on the navigable waters of the United States." This is wholly consistent with the sort of public use described in paragraph 22, above (discussing the desirability of using SSUS as an educational forum to enhance opportunities for younger Americans to learn about ship design and construction).

38. Public Laws 92-296 and 94-536 undeniably indicate a broad interest on the part of Congress—and therefore of the American people in our democratic system—in retaining SSUS afloat and intact well into the future.

39. The Executive Branch in any event need not await express and specific authorization from Congress in order to take SSUS for public use.

## **BALANCING THE EQUITIES**

40. Plaintiff is asking nothing more than that any structural and irreparable alterations to SSUS be delayed until the Executive Branch has been given a reasonable opportunity to consider whether to take SSUS for public use.

41. That relief need not delay any work other than that described in paragraph 11, above, and even that work need not be substantially delayed because only a relatively short and eminently reasonable delay of such work is being requested.

42. Were the Executive Branch to communicate to this Honorable Court its intention *not* to take SSUS for public use, Plaintiff would consent to the dismissal of this action.

43. It is respectfully suggested that a reasonable time to await a decision would be the same as that given in the Brody Opinion, i.e., 90 days.

44. Given that it is unclear whether the Letter has yet been properly received and reviewed by the Executive Branch, the commencement of the above period should await such proper receipt and commencement of review, which may be effected promptly.

45. Toward that end, Plaintiff is prepared to serve the Attorney General of the United States with all pleadings and papers in this action in a manner directed by this Honorable Court.

46. Plaintiff, mindful of Rule this Court's Local Rule 7.1(B), intends to attempt in good faith to resolve the question of whether preliminary injunctive relief is needed by seeking, at the earliest possible opportunity, a meaningful conference with an attorney for the Defendant, hopeful that the County, a government entity bound by a duty to the American people as whole, will voluntarily agree to instruct its agent, the Alabama shipyard, from making any structural and irreparable alterations to SSUS for a reasonable period of time.

47. Although there is no precise precedent for this action, which Plaintiff framed at the outset of this pleading as one seeking "transient equitable relief," such lack of precedent should not be fatal to the cause. Equity indeed evolved to achieve justice by addressing situations not previously contemplated by "the law," and it is undeniably the province and duty of this Honorable Court to fashion appropriate equitable relief under the unique circumstances present in this case.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff NEW YORK COALITION TO SAVE THE STEAM SHIP UNITED STATES, INC. prays that this Honorable Court:

    (1) assume jurisdiction over this action and over the parties;

    (2) direct service of the papers and pleadings in this action upon the Attorney General of the United States in a manner that it sees fit;

    (3) award Plaintiff appropriate transient equitable relief as hereinbefore described; and

    (4) award Plaintiff such other, further, and different relief as this Honorable Court may deem just and proper.

Dated: March 2, 2025
    Port Washington, New York

JAMES M. MALONEY
Attorney for Plaintiff
Law Office of James M. Maloney
33 Bayview Avenue
Port Washington, New York 11050
(516) 767-1395
maritimelaw@nyu.edu