UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | | |
|---|---|---|
| NEW YORK COALITION TO SAVE THE STEAM SHIP UNITED STATES, INC. | * * * | |
| *Plaintiff*, | * | CASE NUMBER: 3:25-cv-212-MCR-HTC |
| v. | * * | |
| OKALOOSA COUNTY, FLORIDA, | * * | |
| *Defendant*. | * * | |

**AMENDED CIVIL COMPLAINT**

NOW COMES Plaintiff, NEW YORK COALITION TO SAVE THE STEAM SHIP UNITED STATES, INC., a/k/a NEW YORK COALITION TO SAVE THE SS UNITED STATES, INC., which hereby files its Amended Civil Complaint against OKALOOSA COUNTY, FLORIDA, as provided by and in conformity with the provisions of Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure,[1] alleging the following:

**PARTIES**

1. Plaintiff (hereinafter, the "Coalition") is a not-for-profit corporation duly formed under the laws of the State of New York on or about October 28, 2024, for the specific and primary purpose of preventing the historic ocean liner SS UNITED STATES, an American-built steamship of inestimable historic value in which the People of the United States have a sovereign interest, from being sunk, dismembered, or destroyed.

---

[1] *See* Doc. 11 (Notice of Intention to File Amended Complaint).

2. Defendant (hereinafter, the "Defendant" or the "County") is a political subdivision of the State of Florida existing by virtue of Article VIII, Section 1(a) of the Florida Constitution. Defendant currently holds title to SS UNITED STATES.

3. SS UNITED STATES, a/k/a STEAM SHIP UNITED STATES (hereinafter, "SSUS" or the "Ship"), although not a party *in rem* as pleaded herein, is nonetheless the sole individual beneficiary of this action in equity. Given that the doctrine of personification of a vessel remains a part of the general maritime law of the United States, the status of SSUS as the beneficiary of this action should be recognized and credited by this Honorable Court.

## JURISDICTION AND JUSTICIABILITY

4. This Court has subject-matter jurisdiction under Article III of the Constitution of the United States. In that this action at its commencement concerned the fate of a vessel in navigation upon navigable waters of the United States, such jurisdiction was provided statutorily by 28 U.S.C. § 1333. Given further that this action concerns the interaction among the three branches of government of the United States in relation to the fate of SSUS, as more fully appears herein, such jurisdiction is further provided statutorily by 28 U.S.C. § 1331. This matter involves a live case or controversy in which the plaintiff has a real interest in the outcome.

5. This Court has personal jurisdiction over the Defendant, and venue is proper, because Defendant exists and resides wholly within the District.

## SUMMARY OF THE ACTION AND PLAINTIFF'S CLAIMED BASIS FOR STANDING

6. The purposes of this action are: (a) to provide the Executive Branch of the United States reasonable time to decide whether SSUS should be taken for public use, with just compensation paid to the County, rather than allowing the Ship, which is due to arrive shortly in

a shipyard in Alabama, to be irrevocably cut apart, dismembered, and sunk as an artificial reef in the waters of the Gulf; and (b) to prevent Defendant from effecting an "end run" around the combined and interactive provisions of the Ocean Dumping Act and the National Historic Preservation Act of 1966, and related rules and regulations, as more fully appears herein.[2]

7. On or about February 10, 2025, the Coalition wrote, sent, and began disseminating an open letter to the President of the United States urging that SSUS should be taken for public use. That letter (hereinafter, the "Open Letter") was sent to the White House by multiple means, including via postal mail, email, and in raw-text form through the White House website. The Open Letter has appeared and/or been replicated on the Coalition's website (nycsavessus.org) as well as on various social media platforms, and has appeared in various news media.

8. A true copy of the Open Letter is annexed hereto as **Exhibit 1** and its content is incorporated herein by reference.[3]

9. The Coalition has no means of knowing whether the Executive Branch of the United States is even aware of the Open Letter, let alone whether it is being considered.

10. On or about March 3, 2025, after being towed from Philadelphia, the Ship arrived at

---

[2] As noted/quoted in *The Tulane Hullabaloo* on March 26, 2025, attributed to a distinguished Tulane maritime law professor: "Deliberately sinking SS United States would constitute dumping for purposes of the Ocean Dumping Act, which requires a permit from the Environmental Protection Agency," Martin Davies, director of the Maritime Law Center at Tulane University Law School, said. "Because the ship is on the National Register of Historic Places, the EPA is required by law to consider any 'adverse effects' the granting of a permit would have on the ship."

"Not surprisingly, sinking the ship would constitute an 'adverse effect' because it would be what the regulations refer to as a change of the character of the property's use that would affect its historic significance. Because the EPA is required to seek ways to avoid, minimize or mitigate any adverse effects, it is difficult to understand how a permit could properly be granted," he said.

See https://tulanehullabaloo.com/69192/data/florida-county-to-convert-ocean-liner-into-artificial-reef/.

[3] The copy of the Open Letter being made an exhibit hereto differs in one minor respect from Exhibit 1 (Doc. 1-2) to the original pleading that is being superseded by this Amended Civil Complaint: the second word in the second line of the third paragraph contained a typographical error ("pubic" rather than "public"), which, once discovered by the Coalition, has been corrected in subsequent replications of the Open Letter.

a shipyard in Alabama, where she will undergo extensive preparation for use as an artificial reef in the Gulf waters off Okaloosa (or possibly Bay)[4] County.

11. As part of the anticipated preparation for that intended use, the twin stacks of SSUS will be removed, as will other parts of her superstructure. If those radically eviscerative measures are taken, any hope of preserving the Ship afloat and intact would be lost forever.

12. It has been estimated that the work in the aforementioned Alabama shipyard (which is being done at the direction of and under the control of Defendant in preparing SSUS to be towed offshore and sunk) will take approximately one year (although estimates vary).

13. The primary relief sought herein need not necessarily delay any work other than that described in the foregoing paragraph 11, and even that work need not be substantially delayed because only a relatively short and eminently reasonable delay of that work is being requested, as more fully appears herein.

14. Plaintiff's claimed basis for standing to bring this action in equity arises out of the following facts: (a) as set forth at paragraph 1 above, the Coalition was formed for the express purpose of saving SSUS after certain events, which will be more fully described herein, had led to a crisis that quickly resulted in the Ship's prior owner's decision to sell the Ship to Defendant to be dismembered and sunk; (b) the Coalition has directly petitioned the Executive Branch of the United States to act, as described in paragraph 7, above; and (c) all three directors of the Coalition have separate and synergistically interactive interests in preserving the Ship that, individually and collectively, differ from that of members of the general public, as more fully appears herein.

15. The Coalition's purpose, as described at paragraphs 1 and 14(c) above, gives rise to a

---

[4] See news report that appeared after this action was commenced, describing Bay County's interest, https://www.wjhg.com/2025/03/11/bay-county-offers-3-million-have-ss-united-states-sunk-closer-its-shores/.

genuine case or controversy in which the Coalition has a unique stake, in that the sinking or other destruction of the Ship would irrevocably and permanently terminate the very reason for the Coalition's existence.

16. James S. Kaplan, Esq. is one of the three directors and a cofounder of the Coalition. For more than thirty-five years, he has been actively involved in trying to preserve and promote historical landmarks in New York City. He is a cofounder, past president and Chairman of the Board of the Lower Manhattan Historical Association (LMHA), which is one of the leading historical protection organizations in New York City. Among the LMHA activities in which Mr Kaplan has been heavily involved are: (a) the annual Saratoga/Yorktown celebration in Trinity Churchyard in Lower Manhattan, marking the graves of Revolutionary War heroes General Horatio Gates, Alexander Hamilton, and Marinus Willet;[5] (b) the annual flag raising and promotion ceremony and revival of Evacuation Day (November 25, the day the Revolutionary war ended with the final evacuation of the British from the United States) as a New York City holiday; and (c) the annual celebration of the anniversary of the 1730 construction of the Mill Street Synagogue in Lower Manhattan, the first Jewish synagogue in North America. Mr. Kaplan has also been the main organizer for the last nine years of the LMHA's July 4 parade through Lower Manhattan as a more patriotic alternative to the July 4 Nathan's hot-dog-eating contest. He has also been responsible for saving from planned destruction the Thomas Paine Memorial building in his native New Rochelle, New York, as well as the street naming of Frances Perkins Way in the Hell's Kitchen area of New York City after FDR's Secretary of Labor, who created the Social Security System. Mr. Kaplan is a graduate of Yale College *(cum laude)* Class of 1971, a law review graduate of Columbia Law School, Class of 1974, and received the LL.M. degree in Taxation from New York University School of Law in 1979. He is

---

[5] See https://www.newyorkalmanack.com/2021/11/marinus-willet-tammany-hall-the-treaty-of-new-york/.

a founding partner of the New York City law firm of Greenberg & Kaplan and is also a regular columnist for the *New York Almanack* (https://www.newyorkalmanack.com), one of New York State's leading history publications. In 1989, he was part of the team that successfully advocated for the placement of Italian sculptor Arturo Di Modica's "Charging Bull" in Bowling Green Park, now considered one of New York City's leading landmarks. Because of his sustained and documented efforts relating to preservation of landmarks and historical objects and sites, Mr. Kaplan's personal stake in the fate of SSUS differs from that of members of the general public.

17. Dan McSweeney is one of the three directors, a cofounder, and the Treasurer of the Coalition. Before cofounding the Coalition, Mr. McSweeney was a cofounder of the S.S. United States Conservancy (hereinafter, the "Conservancy"), a non-profit organization incorporated in Washington, DC, which is not a party to this action, and which purchased the Ship in or about 2011 from her then-owner, Norwegian Cruise Lines, before eventually selling her to Defendant). While active with the Conservancy, Mr. McSweeney's dedication to preserving the Ship afloat and intact was unrelenting. Mr. McSweeney continues to be dedicated to preserving SSUS, ensuring that the Ship remains an iconic symbol of American ingenuity and progress for generations to come (*see* www.nycsavessus.org/who-we-are). Mr. McSweeney's father was a crew member of SSUS. Because of his sustained and documented efforts relating to preservation of SSUS afloat, and his personal relationship to the Ship, Mr. McSweeney's personal stake in the fate of SSUS differs from that of members of the general public.

18. John Quadrozzi, Jr. is the third director of the Coalition. He is the beneficial owner of Gowanus Bay Terminal in Brooklyn, New York, which has on its premises a pier capable of accommodating SSUS and available for such use unencumbered by the presence of any other vessel at that pier. Since in or about 2015, Mr. Quadrozzi pledged to provide that berthing space for SSUS at no cost to her owner (at that time, the Conservancy) until a project generating

revenue were to become viable. For whatever reason, the Conservancy failed to take advantage of Mr. Quadrozzi's offer, but that offer still stands. Mr. Quadrozzi is committed to revitalizing the Brooklyn waterfront in an ecologically sound and socially beneficial manner, and his personal, long-term pecuniary, and public-benefit interests would be irreparably harmed were SSUS to be sunk otherwise rendered incapable of being preserved afloat.

19. The Coalition recently initiated a petition, which, at the time of this filing, has over 13,000 verified signatures, calling for the preservation of the Ship and her return to New York afloat, intact, and capable of being restored as a landmark and national asset.[6]

20. Some or all of the Coalition's members (the three directors described above) would otherwise have standing to sue in their own right, the interests that the Coalition seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in this lawsuit. Indeed, the interests of the three directors each arise out of separate and distinct bases, but combine synergistically within the framework of the organization (i.e., the sum is greater than its parts combined).

## SS UNITED STATES: PAST, PRESENT, AND (POSSIBLE) FUTURE

21. SS UNITED STATES has been described as the flagship of the American merchant marine. Built over the period 1943 to 1951 and launched in 1952, she remains the largest passenger ship ever built in the United States. She was designed to be a luxury ocean liner in peacetime that could switch to wartime transport of up to some 13,000 troops if needed. The Ship broke the trans-Atlantic speed record (which she still holds) on her maiden voyage, crossing eastbound in three days, 10 hours and 40 minutes at an average speed of more than 35 knots without even using her full propulsion capacity. During her approximately 800 trans-Atlantic

---

[6] *See* https://www.change.org/p/last-call-save-the-ss-united-states-say-no-to-reefing-brooklyn-or-bust.

crossings, she carried four U.S. presidents as passengers, and was retired from active use in 1969 after commercial and private air carriage had usurped ocean liners as the preferred, faster means of intercontinental travel.

22. In or about June 1999, SSUS was added to the National Register of Historic Places.[7]

23. The construction of SSUS was in large part federally funded.

24. In order to assist the Court, opposing counsel, the Executive Branch of the United States, and other interested actual and potential stakeholders as well as the public at large, a true copy of a document, the Historic American Engineering Record for SS UNITED STATES ("HAER") (National Park Service, U.S. Department of the Interior, Pub. No. PA-647), is annexed hereto as **Exhibit 2** and its contents are incorporated herein by reference. The same document may be retrieved online directly from a United States government website at the url: https://tile.loc.gov/storage-services/master/pnp/habshaer/pa/pa4100/pa4126/data/pa4126data.pdf.

25. As noted at paragraph 17, above, the Conservancy, a non-profit organization incorporated in Washington, DC, which is not a party to this action, purchased the Ship in or about 2011 from her then-owner, Norwegian Cruise Lines, before eventually selling her to Defendant.

26. At the time of that purchase, the Ship was berthed at Pier 82 in Philadelphia, where she remained until on or about February 19, 2025.

27. As more fully appears herein, events that arose out of a dispute under the Ship's berthing agreement led to a crisis that quickly resulted in the Conservancy's decision to sell the Ship to the County to be sunk as an artificial reef.[8] As the original Complaint in this was action

---

[7] National Register Information ID 99000609, *see* https://npgallery.nps.gov/AssetDetail/NRIS/99000609.

[8] A *New York Time*s article dated Feb. 19, 2025 (the day the Ship left Philadelphia) notes: "If they had been given more time to find a new home for the ship, leaders of the conservancy said, the outcome might have been different. But a federal court ordered the ship evicted from the Philadelphia pier last summer, following a long legal battle between the conservancy and its landlord. That began a race against the clock to find a temporary or

being filed, SSUS had nearly finished crossing the Gulf under tow, and her arrival at the Alabama shipyard was imminent. As noted at paragraph 10 above, on or about March 3, 2025, she arrived there.

28. Were the United States to take SSUS for public use, as the Coalition has urged, long-extant possibilities for preservation and restoration of the Ship, which have unfortunately never been brought to fruition by private interests, could be realized.

29. The timing of what appears to be the imminent destruction of SSUS is especially ironic given that a bill, the Shipbuilding and Harbor Infrastructure for Prosperity and Security (SHIPS) for America Act, was introduced in both the Senate and the House of Representatives in late 2024. This "comprehensive legislation [is intended] to revitalize the United States shipbuilding and commercial maritime industries."[9] Were the United States to take SSUS for public use, as the Coalition has urged, the Ship could serve both as a national historic site and as a valuable educational resource to interest, educate, and inspire future generations of potential naval architects and marine engineers in pursuing such career paths by showing them firsthand a masterpiece of American innovation and achievement in ship design and construction, thereby helping to inspire future innovations and achievements in those fields in the United States.

## THE CRISIS THAT LED TO THE PRESENT SITUATION

30. As noted above at paragraph 26, the Ship remained in Philadelphia after the Conservancy purchased her in 2011. In fact, SSUS sat at Pier 82 in Philadelphia for approximately thirty years, roughly half of which was before the Conservancy acquired her.

---

permanent new location . . ." *See* https://www.nytimes.com/2025/02/19/us/ss-united-states-final-voyage.html.

[9] https://www.kelly.senate.gov/newsroom/press-releases/sen-kelly-sen-young-rep-garamendi-rep-kelly-introduce-ships-for-america-act-to-revitalize-us-shipbuilding-and-commercial-maritime-industries/

31. Upon purchasing the Ship, the Conservancy, on or about June 15, 2011, entered into an agreement for berthing services with Penn Warehousing & Distribution Inc. ("PWD"), which leases the pier from the Philadelphia Regional Port Authority.

32. The aforementioned agreement, a two-page document entitled "Continuation of Berthing Services for S.S. United States" (hereinafter, the "Berthing Agreement"), provided that the Conservancy would pay PWD $850.00 per day to berth SSUS there.

33. After it acquired the Ship in 2011, the Conservancy worked with potential developers to plan to refurbish the Ship and/or to develop her as a permanently moored fixture at some other location where she could serve as a hotel, condominiums, or a multi-purpose venue.  The Conservancy covered its monthly carrying costs of $50,000-$60,000 (berthing plus other expenses) through a combination of donations and income from exclusive option agreements with potential developers.

34. In or about 2021, PWD apparently came to view the Ship's continued presence at Pier 82 to be detrimental to its interests. It decided to force the issue to get the ship off the dock by doubling the daily berthing charge, from $850 to $1,700, effective August 24, 2021.

35. The Conservancy paid the daily rate of $1,700 for a month or two, but thereafter re-adjusted its payments back to the original rate and continued to make payment at the daily rate of $850.

36. In a letter dated March 11, 2022, PWD notified the Conservancy that "the tenancy of [the Conservancy] at the Port of Philadelphia, Pier 82 is terminated as of March 26, 2022."  PWD sought payment for the alleged unpaid dockage fees and demanded that the Conservancy "move the Vessel by March 26, 2022."  The Conservancy did not do so, and on March 28, 2022, PWD filed a lawsuit in Pennsylvania state court against the Conservancy for money damages and ejectment. That action was removed by the Conservancy to the United States District Court for

the Eastern District of Pennsylvania, where it proceeded to trial and final resolution.

37. A true copy of the June 14, 2024, Memorandum Opinion by the Honorable Anita B. Brody, United States District Judge (hereinafter, the "Brody Opinion"), is annexed hereto as **Exhibit 3** and its contents are incorporated herein by reference.[10]

38. While Plaintiff does not allege, contend, or suggest that the Brody Opinion contained any error, the deadline imposed thereby (see Brody Opinion at 14: "As a matter of equity, I will toll the effective date of the termination through this period of litigation. The effective date of the termination, by which date the Conservancy must remove the Ship from Pier 82, will be 90 days from the date of this decision.") undeniably created nothing short of a crisis for the Conservancy, which needed to find, within three *months*, a place to berth (or a means to dispose of) a nearly-1,000-foot-long vessel that had been at the same berth for three *decades*. *Cf. New York Times* reporting as set forth at footnote 8 on page 8 above.[11]

39. On August 27, 2024, some 74 days into the 90-day period imposed by the Brody Opinion, the Conservancy and the County entered into a purchase-and-sale agreement (hereinafter, the "Contract of Sale") to sell the Ship to the County. A true copy of the Contract of Sale is annexed hereto as **Exhibit 4**.[12]

40. Title to the Ship was subsequently transferred to the County.

---

[10] The allegations set forth in paragraphs 31-36 herein are taken substantially from the recitation of facts in the Brody Opinion. The quoted language at paragraph 36 is taken from page 5 thereof.

[11] Whether the Conservancy could indeed have found such berthing nearby in the northeastern United States—and even in the Ship's historic home port of New York City—has, given subsequent events, become an academic question, although the Coalition has already indicated that such appears to have been possible (see final sentence in second paragraph of Exhibit 1 (Open Letter)).

[12] The same document may be retrieved online directly from a County website at the url: https://okaloosacountyfl.iqm2.com/Citizens/FileOpen.aspx?Type=4&ID=44708&highlightTerms=ssus.

## THE ROLES OF THE POLITICAL BRANCHES IN RELATION TO THE SHIP

41. As explained in paragraph 38, above, the federal judiciary played a role, albeit justly and justifiably, in necessitating the speedy removal of the Ship from the berth she had occupied for some 30 years, which in turn resulted in its sale to Defendant for use as an artificial reef. The Court, in rendering its decision, correctly considered only the interests of the parties to the litigation and not those of the American people as regards the future of the Ship.

42. Given that SSUS is not just *any* vessel, but a unique one that has great cultural and historical significance to the nation that shares its name, the political branches of our government (or at least the one more capable of taking prompt action, i.e., the Executive) should be given at least some opportunity to weigh in before the Ship is irrevocably physically altered such that any hope of her continuing her existence intact and afloat is lost forever. (*Cf.* paragraph 11, above.)

43. Congress, for its part, has spoken twice with regard to the possibility of the United States taking SSUS for public use, but both such pronouncements were during the 1970s and neither was meant to address the precise situation at hand today. Nevertheless, as the Coalition wrote to the President in its Open Letter (Exhibit 1 hereto):

> Public Laws 92-296 and 94-536, taken together, authorize the United States to take the vessel for pubic use, paying just compensation to her owner. The more recent statute widens the scope of potential public use beyond the earlier one's "for operation under the American flag."

True copies of the aforementioned public laws are annexed hereto as **Exhibit 5**.

44. Public Law 94-536, enacted in 1976, widens the scope of potential public use to include "for use as a floating hotel in or on the navigable waters of the United States." This is wholly consistent with the sort of public use described in paragraph 29, above (discussing the desirability of using SSUS as an educational forum to enhance opportunities for younger Americans to learn about ship design and construction).

45. Public Laws 92-296 and 94-536 undeniably indicate a broad interest on the part of Congress—and therefore of the American people in our democratic system—in retaining SSUS afloat and intact well into the future.

46. The Executive Branch in any event need not await express and specific authorization from Congress in order to take SSUS for public use.

## BALANCING THE EQUITIES

47. Plaintiff is asking nothing more than that any structural and irreparable alterations to SSUS be delayed until the Executive Branch and appropriate federal agencies (including the Environmental Protection Agency ("EPA")) have been given a reasonable opportunity to, as appropriate to each: (a) consider whether to take SSUS for public use; and (b) address the question of whether making structural changes to the Ship in the Alabama shipyard in orderto prepare it for use as an artificial reef would amount to an"end run" around the combined and interactive provisions of the Ocean Dumping Act and the National Historic Preservation Act of 1966, and related rules and regulations.  *See generally* footnote 2 above.

48. Were the Executive Branch to communicate to this Honorable Court or to Plaintiff its intention *not* to take SSUS for public use, Plaintiff would consent to the dismissal of the First Cause of Action as set forth hereinafter.

49. It is respectfully suggested that a reasonable time to await a decision from the the Executive Branch would be the same as that given in the Brody Opinion, i.e., 90 days.

50. Given that it is unclear whether the Open Letter has yet been properly received and reviewed by the Executive Branch, the commencement of the above period should await such proper receipt and commencement of review.

51. Although there is no precise precedent for such equitable causes of action, such lack

of precedent should not be fatal to the causes. Equity indeed evolved to achieve justice by addressing situations not previously contemplated by "the law," and it is undeniably the province and duty of this Honorable Court to fashion appropriate equitable relief under the unique circumstances present in this case.

**OCEAN DUMPING ACT & NATIONAL HISTORIC PRESERVATION ACT OF 1966**

52. The Marine Protection, Research, and Sanctuaries Act ("MPRSA"), also known as the Ocean Dumping Act, prohibits dumping into the ocean material that would unreasonably degrade or endanger human health or the marine environment.

53. Ocean dumping cannot legally occur unless a permit is issued under the MPRSA, usually by the EPA. The reefing of SSUS would require such a permit.

54. It appears that Defendant is preparing the Ship for reefing first, and seeking such a permit later.

55. The National Historic Preservation Act of 1966 ("NHPA"), specifically Section 106 thereof, mandates that any action that would threaten the future of a federally funded historical object, such as the SSUS,[13] be reviewed by the applicable federal agencies to determine what the best course would be to protect the historical object.

56. The NHPA may further require mitigating actions to counter any adverse impact on the historical object.

57. Courts have recognized the ability private citizens to seek NHPA review through civil actions.

58. Here, it appears that Defendant has not yet sought NHPA review by any of the appropriate federal agencies. Meanwhile, SSUS was a federally funded ship and is listed on the

---

[13] See paragraph 23 above.

United States National Register of Historic Places (see paragraph 22 and footnotes 2 and 7 above).

59. Although under the MPRSA or Ocean Dumping Act Defendant will need EPA approval (i.e., a permit) before reefing the Ship in the Gulf, it appears that Defendant intends to proceed with "remediation" (i.e., removal of the stacks and superstructure, which will negate the Ship's value as an above-water landmark, see paragraph 11 above) first. Since any adverse impact on the historical object would by then have already have occurred, rendering NHPA review moot, this would amount to an "end run" around the combined and interactive provisions of the Ocean Dumping Act and the National Historic Preservation Act of 1966

## FIRST CAUSE OF ACTION

60. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 59 as if fully set forth herein.

61. Plaintiff has standing to seek, and petitions this Honorable Court for, appropriate equitable relief as described at paragraph 47(a) above.

## SECOND CAUSE OF ACTION

62. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 59 as if fully set forth herein.

63. Plaintiff has standing to seek, and petitions this Honorable Court for, an Order requiring Defendant to seek a permit under the MPRSA or Ocean Dumping Act *before* removal of the stacks and superstructure, which will negate the Ship's value as an above-water landmark, see paragraph 11 above.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff NEW YORK COALITION TO SAVE THE STEAM SHIP UNITED STATES, INC. prays that this Honorable Court:

    (1) assume jurisdiction over this action and over the parties;

    (2) direct service of the papers and pleadings in this action upon the Attorney General of the United States and/or appropriate agencies in a manner that it sees fit;

    (3) award Plaintiff appropriate equitable relief as hereinbefore described; and

    (4) award Plaintiff such other, further, and different relief as this Honorable Court may deem just and proper.

Dated: April 18, 2025
       Port Washington, New York

JAMES M. MALONEY
Attorney for Plaintiff
Law Office of James M. Maloney
33 Bayview Avenue
Port Washington, New York 11050
(516) 767-1395
maritimelaw@nyu.edu