# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

NEW YORK COALITION TO SAVE　　\*
THE STEAM SHIP UNITED　　　　　\*
STATES, INC.　　　　　　　　　　\*
　　　　　　　　　　　　　　　　\*　　　　3:25-cv-00212-MCR-HTC
　　　　*Plaintiff*,　　　　　　\*
v.　　　　　　　　　　　　　　　\*
　　　　　　　　　　　　　　　　\*
OKALOOSA COUNTY, FLORIDA,　　　\*
　　　　　　　　　　　　　　　　\*
　　　　*Defendant*.　　　　　　\*

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION TO DISMISS

TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

INTRODUCTION AND SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

JUSTICIABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

SECTION 106 OF THE NHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

FURTHER AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## PRELIMINARY STATEMENT

This memorandum is respectfully submitted in opposition to Defendant's motion (Doc. 16) for an order dismissing the Amended Complaint (Doc. 12), which si the operative pleading, having superseded the Complaint (Doc. 1) that was filed on March 2, 2025, while the subject vessel was enroute from Philadelphia to Mobile.

## INTRODUCTION AND SUMMARY

From a historic-preservation perspective, this lawsuit is of national importance, crying out for judicial review, which Plaintiff is now seeking from this Honorable Court, which in turn sits as a court of equity in maritime and admiralty matters such as this, as more fully appears herein.

The County of Okaloosa is planning on destroying the SS UNITED STATES (the "SSUS"), a ship on the national register of historic places, when there has apparently been no compliance with the National Historic Preservation Act ("NHPA"), which in turn requires a public historic-preservation process to occur prior to substantially altering the ship.

Okaloosa County has begun and is continuing to make substantial alterations to the SSUS in Mobile, Alabama, where the ship is currently docked. The County is a public entity and has a legal and moral duty to comply with

3

basic historic-preservation laws.  In its motion papers, the County refers repeatedly to the SSUS as its "tangible property," making no reference to any responsibilities with respect to this historically significant ship.

Rather than having to explain what, if anything, it has done to comply with the NHPA, the County would like this matter to simply be dismissed without any discovery whatsoever concerning its efforts to comply with the NHPA. Plaintiff humbly asks this court to require the County to answer the most basic questions regarding its lack of compliance with the NHPA before the ship is destroyed forever.

The following unanswered questions come to mind: Has the County yet been contacted by a government agency about the NHPA Section 106 historic preservation precess? If so, when? If the County has not been so contacted, is it aware of any duty to comply with the NHPA?

Plaintiff is engaging in public-interest advocacy, which has only been required because the County has thus far refused to disclose publicly the most basic questions to which the general public is entitled to have answers. Dismissing this case at such an early stage, with no discovery, deprives the public of this most basic right. We ask that this Court assist us in ensuring compliance with the NHPA before this ship is destroyed.

On March 11, 2025, a telephonic Local Rule 7.1(B) Attorney Conference was held among two attorneys for the County (Elmer Ignacio and Matthew Shaud), one of the founding members of the Coalition who is an attorney (James Kaplan) and one who is not (John Quadrozzi), another attorney who is volunteering his time and effort in this matter (Daniel Berk), and the undersigned. The conference was held preliminarily to a possible motion seeking interim equitable relief (which the Coalition has not made) and before the initial pleading was amended to add allegations relating to the NHPA. The day after the conference, the undersigned sent a detailed summary of the conference to opposing counsel, which was received without objection or request for amendment. In it was a list of substantive points discussed, including "(4) National Historic Preservation Act considerations (raised by Daniel Berk, Esq.), which contained the following footnote 1:

Section 106 of the National Historic Preservation Act of 1966 requires that any action that would threaten the future of a federally funded historical object be reviewed by the applicable federal agencies to determine what the best course would be to protect the historical object, with mitigating actions possibly taken to counter any adverse impact on the historical object. The design and construction of the subject vessel was in part funded by the United States, and the vessel is listed in the United States National Register of Historic Places, reference number 99000609. The Coalition acknowledges that there are no allegations relating to the National Historic Preservation Act of 1966 in the Complaint, but has raised this point as part of a broader discussion about the fate of the vessel and the County's duty, as a public entity, to the United States and to

the American people as a whole, see Complaint at ¶ 46.

The County has thus been aware that compliance with the NHPA and the County's duties has been a concern of the Plaintiff since some nine days after the action was commenced, and well before the complaint was amended to add allegations about the NHPA.

## <u>JUSTICIABILITY</u>

It is axiomatic that federal courts are courts of limited jurisdiction. This case is far from typical or usual, but it is justiciable.

Article III of the U.S. Constitution defines the boundaries of subject matter jurisdiction for the courts. Specifically, in the present context, it extends the judicial power of the United States to "all Cases of admiralty and maritime Jurisdiction." This grant of judicial power has been implemented by Congress in 28 U.S.C. § 1333, which states that "The district courts shall have original jurisdiction, exclusive of the Courts of the States, of (1) any civil case of admiralty or maritime jurisdiction …." In current usage the terms "admiralty jurisdiction" and "maritime jurisdiction" are used interchangeably. The Constitution itself does not enumerate the types of "matters" or "cases" that fall within the terms "admiralty and maritime jurisdiction." Indeed, the Admiralty Clause in Article III does not disclose or even provide the means for ascertaining

whether a particular dispute is an admiralty or maritime case. This task has been performed primarily by the courts and, to a lesser extent, by Congress. Also, the Constitution does not specify the legal rules to apply in resolving admiralty and maritime disputes. It does not even point to the sources of substantive law that judges should consult to derive such rules. This task also has been performed primarily by the courts and, to some extent, by Congress. In this regard, federal courts have not merely created rules to fill gaps or to supplement legislation as they have in virtually other areas of substantive federal law. Instead, they have played the leading role—*and continue to play the leading role*—in creating a body of substantive law referred to as the "general maritime law." See generally Robert Force, An Essay on Federal Common Law and Admiralty, 43 St. Louis U. L.J. 1367 (1999).

No federal statute provides general rules for determining admiralty jurisdiction, nor does any statute comprehensively enumerate the various categories of cases that fall within admiralty jurisdiction. *See id.*

A key attribute that American courts have considered in determining whether a given case gives rise to federal "admiralty and maritime jurisdiction" is whether (as here) the case involves a vessel in navigation on navigable waters

of the United States.[1]  Early on, the Supreme Court equated the scope of admiralty jurisdiction with "navigable waters," which are those that either connect two or more state or connect to the sea.  *Jackson v. The Steamboat Magnolia*, 61 U.S. (20 How.) 296 (1857); see also Robert Force, Admiralty and Maritime Law (2d ed. 2013), at 3-4 (a publication of the Federal Judicial Center available online at https://www.fjc.gov/sites/default/files/2014/Admiralty2d.pdf).

While admiralty cases are generally classified as arising either in tort or in contract, there is no sound reason why these general categories need be or are exhaustive or even mutually exclusive. For one thing, courts have recognized that certain claims, such as claims for cargo damage, may arise in either or both of those categories at once.[2]

More importantly for present purposes, federal courts sitting in admiralty are courts of equity, and because the general maritime law remains largely judge-made, those courts are free to fashion new rules and recognize new causes of action wherever justice so requires with a great deal more freedom than would be proper in the vast majority of federal cases, where it is arguably true that "there

---

[1] Defendant appears to acknowledge that this case "involves a vessel in navigation on navigable waters of the United States." See footnote 6 at page 27, Doc. 16.

[2] *See, e.g.*, James M. Maloney, A Breach in Tort's Clothing: Pleading Cargo Claims to Gain Lien Priority, 27 J. Mar. L. & Com. 609 (1996).

is no federal general common law." *Erie R.R. v. Tompkins*, 304 U.S. 64, 78

(1938). The "general maritime law," as mentioned at page 7, above, is a glaring

exception to that otherwise largely accurate pronouncement.[3]

The United States Supreme Court in 1885 had this to say about the powers

and duties of a federal court sitting in admiralty regarding matters of equity:

> [I]n this country, a court of admiralty, within the scope of its
> powers, acts upon equitable principles; and when the facts before it,
> in a matter within its jurisdiction, are such that a court of equity
> would relieve, and a court of law could not, it is the duty of the court
> of admiralty to grant relief.

*Watts v. Camors*, 115 U.S. 353, 361 (1885).

Here, a unique and dire situation is at hand that is crying out for the sort of

equitable intervention that perhaps only a court sitting in admiralty *could* offer.

A precious and irreplaceable artifact, the apex of American ship design and

shipbuilding, is slated for irreparable destruction by "scuttling" (Defendant's

own term, see Doc. 16 at page 3) her in the waters of the Gulf. This situation has

occurred not because of years of planning, reflecting, and decisonmaking, but, in

sharp contrast, because of a crisis that resulted from the vessel's needing to

---

[3] As noted in Erwin Chemerinsky, Federal Jurisdiction (8th ed. 2021), at 409, admiralty and maritime jurisdiction gives rise to a huge area of federal substantive common law (so huge, in fact, that the author had no choice but to exclude any discussion of it beyond that mere mention from his already voluminous treatise).

vacate, with only three months' notice, the pier where she had sat safely and

intact for three *decades*.  See generally Doc. 12-3 (exhibit to Amended

Complaint, consisting of the June 14, 2024, Memorandum Opinion of District

Judge Anita Brody).

The former owner of the vessel, the SS United States Conservancy,

explains the development of the crisis, and the action it took to address it, on its

website:

> Unable to save the SS United States in her current state and
> under a court-ordered deadline, we faced the painful but
> unavoidable choice between scrapping America's Flagship or
> converting her into an artificial reef in tandem with a land-based
> museum. We chose the latter as the more dignified path. As part
> of the settlement that resulted from court-ordered mediation, the
> SS United States Conservancy agreed to the sale of America's
> Flagship to Okaloosa County, Florida, which in turn facilitated
> her removal from the pier to comply with the Court's order.
> While this is not the outcome we originally envisioned, the ship
> will have a future.

SS United States Conservancy, Answers to Frequently Asked Questions, WHY

DID THE SS UNITED STATES CONSERVANCY PARTNER WITH

FLORIDA'S OKALOOSA COUNTY TO CONVERT AMERICA'S

FLAGSHIP INTO THE WORLD'S LARGEST ARTIFICIAL REEF?,

https://www.ssusc.org/frequently-asked-questions, last visited June 11, 2025

(true copy also attached hereto as Exhibit A).

Meanwhile, "America's Flagship" could still be saved from "scuttling," and Congress has—twice in the last century—made it clear that she could be taken for pubic use.  *See* Doc. 12-5 (exhibit to Amended Complaint).  Ironically, just as the Shipbuilding and Harbor Infrastructure for Prosperity and Security (SHIPS) for America Act is on its way to enactment (having been reintroduced on April 30, 2025, with bipartisan support from legislators), a vessel that could serve well as a historic and educational site in furtherance of the aims of that legislation once enacted,[4] is about to be irrevocably "scuttled." The SHIPS for America Act (the "Act") as reintroduced aligns some of its goals with Executive Order 14269, issued on April 9, 2025, by the President, "Restoring America's Maritime Dominance," which seeks to address national security concerns with a collaborative interagency approach to increase U.S. competitiveness in the shipbuilding and maritime sectors. The Act would also the establish Centers of Excellence for Domestic Maritime Workforce Training and Education, which would train and educate workers launching careers in the maritime industry,

---

[4] *See* Amended Complaint at paragraph 29: "Were the United States to take SSUS for public use, as the Coalition has urged, the Ship could serve both as a national historic site and as a valuable educational resource to interest, educate, and inspire future generations of potential naval architects and marine engineers in pursuing such career paths by showing them firsthand a masterpiece of American innovation and achievement in ship design and construction, thereby helping to inspire future innovations and achievements in those fields in the United States." A federally funded program bringing high school students to live aboard a refurbished SSUS for internships would go a long way toward attracting young minds to these fields.

11

helping to prepare the next generation of maritime professionals, and would create a Maritime Career and Technical Education Advisory Committee.[5]

It is fair to say that the People of the United States (who are, at least in theory, the true federal sovereign) have a federal sovereign interest in "America's Flagship," even if the vessel has recently become, as Defendant repeatedly puts it, Okaloosa County's "tangible property." For one thing, of the $77.7 million that it cost to build her, $44.9 million[6] or 57.7% was paid for by the People of the United States through a combination of national defense features subsidy and construction differential subsidy. Doc. 12-2 (exhibit to Amended Complaint consisting of the Historic American Engineering Record (HAER) for the vessel), at page 3 (pdf page 4 of 13).

But money alone is only part of the story: the vessel's unique status as an American naval-architecture and shipbuilding marvel puts her on a par with such historical objects as the Liberty Bell. Were the latter to be somehow acquired as the "tangible property" of a local government that intended to melt the Bell down

---

[5] *See* Pribyl, Tenev, Luzwick, Lehrer, & Martin, "Bipartisan Bill Reintroduced to Enhance U.S. Shipbuilding, Maritime Sector, National Security" (Holland & Knight Alert), https://www.hklaw.com/en/insights/publications/2025/05/bipartisan-bill-reintroduced-to-enhance-us-shipbuilding-maritime, last accessed June 11, 2025.

[6] It is estimated that 44.9 million dollars in 1952 (the year that the ship was launched) would be the equivalent of over 50 **billion** dollars today. *See, e.g.*, online converter at https://www.in2013dollars.com/us/inflation/1952?amount=4490000000&endYear=2025.

and make a statue from the metal to grace one of its parks as a tourist attraction, it would be indisputable that the federal sovereign interest in maintaining the Bell intact would have at least some weight in assessing the limitations on the "bundle of sticks" of rights that such a local government would have in its "tangible property" of the metal comprising the Bell. The same is true here: "scuttling" the SSUS so that its magnificently designed and still fully intact hull will rust away over time, like melting down the Liberty Bell, would inevitably and irrevocably change the precious object's essential form to something unrecognizable as its former self.  Melting is quicker and rusting is slower, but the end result is the same.

Against this backdrop of balancing the equities, Plaintiff has brought this action to provide some small counterweight and gentle braking[7] to an accelerated process of destruction that was begun less than a year ago when Judge Brody signed her Order.  It is not argued that the Order was error, but it is undeniable that, in the dispute between the Conservancy and Penn Warehousing, one important "party" lacked any advocate whatsoever. That party was, of course,

---

[7] According to a recent article in the online news source www.al.com, Mr. Nick Tomecek, identified as a "spokesperson for Okaloosa County," commented that the instant "lawsuit is not affecting [the County's] timeline for deploying the ship from Mobile to Florida." https://www.al.com/news/2025/05/were-part-of-its-history-now-mobile-embraces-final-chapter-of-the-ss-united-states.html.

the SSUS herself.

Personification of a vessel is a "quasi-fictional" legal doctrine that has been alive and well in the United States since the "reception" of the existing judge-made body of admiralty or maritime law from England.  Although the doctrine or "quasi-fiction" of vessel personification relates most often to *in rem* actions to enforce maritime liens where the vessel is a defendant (obviously not the case here),[8] the Supreme Court has, at least in dicta, recognized that "a vessel may be assumed to be a person *for the purpose of filing a lawsuit and enforcing a judgment*." *Continental Grain Co. v. The FBL-585*, 364 U.S. 19, 23 (1960) (emphasis added) (citing Oliver Wendell Holmes, Jr., The Common Law (1881), 26-27 ("It is only by supposing the ship to have been treated as if endowed with personality, that the arbitrary seeming peculiarities of the maritime law can be made intelligible, and on that supposition they at once become consistent and logical.")

Whatever the conceptual limits of the personification doctrine, the fact that the SSUS had no advocate in the Eastern District of Pennsylvania litigation that led to her current fate of being slated for "scuttling" should carry some weight in assessing the equitable considerations inherent in this action. It was, after all, the

---

[8] See generally Force, cited in full at page 8, above, at 31.

federal judiciary that in large part created the crisis that the Conservancy

described (quoted more fully at page 10, above and in Exhibit A), which the

Conservancy described as follows:

> As part of the settlement that resulted from court-ordered mediation,
> the SS United States Conservancy agreed to the sale of America's
> Flagship to Okaloosa County, Florida, which in turn facilitated her
> removal from the pier to comply with the Court's order.

Again, while that Order may not have been error, it was certainly arrived

at without the benefit of any advocacy on behalf the SSUS herself.  Indeed, the

Plaintiff corporation here was formed precisely to advocate on behalf of (i.e., to

"save") the SSUS after the Order was entered.  *See* Doc. 12 (Amended

Complaint) at ¶ 14 (alleging that "the Coalition was formed for the express

purpose of saving SSUS after certain events, which will be more fully described

herein, had led to a crisis that quickly resulted in the Ship's prior owner's

decision to sell the Ship to Defendant to be dismembered and sunk.").

That express purpose for which the Plaintiff corporation was formed, in

turn, relates to its organizational standing, which will be discussed next.

**STANDING**

As noted at the end of the preceding section, Plaintiff's very reason for coming into being and to exist, its *raison d'être*, was to address the crisis that had arisen after the events of summer 2024, when the SSUS had to vacate the Philadelphia pier that she had occupied for three decades in a mere three months, which led (as described more fully by the Conservancy at pages 10 and 15 above and in Exhibit A) to the sale of the ship to Defendant for "scuttling." Put another way, and as specifically alleged at ¶ 1of the Amended Complaint, "on or about October 28, 2024, for the specific and primary purpose of preventing the historic ocean liner SS UNITED STATES, an American-built steamship of inestimable historic value in which the People of the United States have a sovereign interest, from being sunk, dismembered, or destroyed."

It follows, therefore, that the imminent potential injury to Plaintiff (sinking, dismembering, or destruction of the ship) is both concrete and particularized: concrete because it is "de facto and real, not merely abstract,"[9] and particularized because Plaintiff's interest in preservation of the SSUS is neither "undifferentiated from those of any other interested observers" nor that of "merely a concerned bystander," Defendant's brief (Doc. 16) at 15 (internal quotation marks omitted).

---

[9] Defendant's brief (Doc. 16) at 12 (internal quotation marks omitted).

Unlike any other known potential challengers to the County's "scuttling" plan, Plaintiff itself will suffer the irreparable and permanent harm of having the very purpose for its existence rendered moot when and if that plan occurs.

It may be countered that such an argument amounts to a sort of potential "bootstrapping" whereby an organization could be created for the sole purpose of having standing to bring a given action, but it is submitted that the question of whether such an action would be justiciable effectively subsumes that aspect of the standing inquiry and negates the "bootstrapping" concern. That is especially applicable where, as here, there exists a live case or controversy about a matter that also happens to be of concern to many citizens and the outcome of which would definitively determine one way or the other the specific organizational plaintiff's continued reason for existence. In such circumstances, which are present here, the important question thus becomes whether the action that such a plaintiff brings stands on its own in terms of justiciability. If not, the question of organizational standing need never be addressed. If so, the threshold for Article III justiciability has been met, and there is no need to consider or conjecture whether the concrete and particularized injury to the organization threatened or complained of may be the result of such putative "bootstrapping."

As the Supreme Court has explained, "where a harm is concrete, though

widely shared, the Court has found injury in fact." *Federal Election Commission v. Atkins*, 524 U.S. 11, 124.  Here, the harm that Plaintiff seeks to prevent is both concrete and would affect the sovereign interests of the People of the United States broadly, but it is nonetheless particularized because Plaintiff's interest in preservation of the SSUS is special and different owing to the nature of its foundational organizational purpose.

The Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), is further illustrative that injury to, or frustration of, a primary organizational purpose can, as here, be the basis for a cognizable injury in fact to an organization giving rise to organizational standing.  In *Havens*, several plaintiffs had challenged the Petitioner realty company's racial discrimination in providing information about housing.  One of the plaintiffs, Housing Opportunities Made Equal ("HOME") was an organization dedicated to securing open housing free from racial discrimination.  HOME claimed that the defendant's discriminatory practices undermined its ability to achieve its goals. The Court unanimously upheld standing for the organization, reasoning that the organization had standing because the defendant's practices injured HOME's ability to accomplish its purpose.

Defendant relies heavily on *Gardner v. Mutz*, 962 F.3d 1329 (11th Cir.

18

2020) in arguing that Plaintiff lacks standing here.  Certain aspects of *Gardner*

are, of course, highly applicable.  For example, at page 11 of its brief, Defendant

writes: "Although they are related concepts, concreteness and particularity are

different, and Plaintiff, nonetheless, must demonstrate both (*citing Gardner*, 962

F.3d at 1341.  That is certainly an accurate statement, but, as Plaintiff has already

explained above, the threatened injury here is both concrete and particular as to

Plaintiff.

But the Circuit Court's basis for denying standing in *Gardner* is readily

distinguishable from the situation here.  After deciding that it was appropriate to

address the standing issues that had been present along rather than mootness issues

that had arisen during the pendency of the appeal, the court began its analysis by

writing that "a plaintiff's alleged injury must be *both* concrete and particularized

[but] the plaintiffs' injuries here are neither."  962 F.3d at 1341.  The *Gardner*

court then analyzed each of the plaintiffs'claims as pleaded. It began with

concreteness:

> The plaintiffs' alleged injuries here are simply too "abstract" to
> implicate Article III.  Most generally, the plaintiffs assert that the City
> "abridged [their] right to free speech ... by deciding to remove the
> [c]enotaph which communicated minority political speech in a public
> forum." But surely the naked recitation of a constitutional claim isn't
> sufficient; if it were, every § 1983 plaintiff would, by definition, have
> standing to sue. Somewhat (but not much) more specifically, the

> plaintiffs assert that the monument's relocation infringes their
> interests "preserv[ing] the history of the south," "expressing their free
> speech[ ] from a Southern perspective," "'vindicat[ing] the cause' for
> which the Confederate Veteran fought," and "protect[ing] and
> preserv[ing] Memorials to American veterans." But those injuries,
> too, are pretty amorphous. What exactly is the (or a) "Southern
> perspective"? What exactly was "the cause for which the Confederate
> veteran fought," and what exactly does it mean to "vindicate" it?

*Id.* (quotation marks and ellipsis in original).

The court thus found the plaintiffs' claims abstract rather than concrete. Here, Plaintiff is claiming, quite specifically, that destruction of the SSUS would cause very concrete harms, depriving itself permanently and irrevocably of not only its "*raison d'être*" as explained above, but it and the general public of safeguards intended to protect historic objects.

The *Gardner* court also analyzed the plaintiffs' claims as to particularity, 962 F.3d at 1341-42, finding that plaintiffs had alleged no harm different in kind from the general public, explaining that their ...

> interests in "preserv[ing] the history of the south," "expressing their
> free speech[ ] from a Southern perspective," " 'vindicat[ing] the
> cause' for which the Confederate Veteran fought," and "protect[ing]
> and preserv[ing] Memorials to American veterans" ... are
> "undifferentiated," collective—not "distinct" to any of the plaintiffs.

*Id.* at 1342 (quotation marks and ellipsis in original).

But, as explained above, Plaintiff here would be harmed in a manner

different from the general public in that its very purpose would be destroyed with the ship, a proposition that has support in the Supreme Court cases cited above.

Finally, as the individual standing of its members, Plaintiff is not a member organization.  However, relevant allegations were made as regards each of its three directors (Kaplan, McSweeney, and Quadrozzi) in the Amended Complaint.  Defendant has attempted to downplay the significance of each in its brief, but many facts are disputed, especially as to Mr. Quadrozzi and the history of his having offered to make his Brooklyn pier available to dock the SSUS at no initial cost to its owner, which was then the Conservancy.  Mr. Quadrozzi's position is that the Conservancy ignored his offer for many years because it "had its eye on" a Manhattan rather than Brooklyn venue, and not because of any inherent or structural unsuitability of the 1,000-foot dock at Brooklyn location (although dredging would have been required to get the ship there).

Since there has been no discovery, it would be premature to determine that Plaintiff lacks standing on the basis of the interests of its (admittedly few) members (i.e., directors) under the standards articulated in *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333 (1977).

## SECTION 106 OF THE NHPA

The  National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 300101-320303, creates affirmative duties for federal agencies. Its initiatives are carried out in large part through section 106, which provides that "[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any *undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license*, shall take into account the effect of the undertaking on any historic property."  54 U.S.C. § 306108 (emphasis added).

Defendant admits in its brief at 29 that the term "undertaking" includes a "project, activity, or program ... requiring a Federal permit, license, or approval."

At the time of the filing of the Amended Complaint, Plaintiff believed that the agency that would provide the "permit, license, or approval" to "scuttle" the SSUS would be the Environmental Protection Agency ("EPA") because the MPRSA or Ocean Dumping Act would be the statutory basis for delegating the appropriate agency.  In its brief, the County convincingly

22

argues that "an exemption applies when disposition is 'for a purpose other than disposal, when such construction or such placement is otherwise regulated by Federal or State law or occurs pursuant to an authorized Federal or State program.'" Doc. 16 at 26 (citing MPRSA, 33 U.S.C. § 1402(f)).  Contemporaneously with the filing of its motion papers, the County introduced three Army Corps of Engineers (the "ACE") permits (Docs. 15-1, 15-2, and 15-3) as part of an unopposed request for judicial notice (Doc. 15).  Before acquiescing to that request, Plaintiff had no idea that the ACE was the permitting agency.  (This is unsurprising given that discovery was stayed early on in the matter.)

At page 27 of its brief, Defendant writes:

> Even if this Court were to consider that a permit issued by the Army Corps of Engineers is a permit pursuant to the MPRSA, Count II of Plaintiff's Amended Complaint still warrants dismissal because of mootness. As evidenced by the documents within the County's contemporaneously filed Request for Judicial Notice (Docs. 15, 15-1, 15-2, 15-3), the County has applied for, and the Army Corps of Engineers has issued, permits authorizing the County to create artificial reefs by sinking vessels, including the SS United States.

Doc. 16 at 27.

Yet all three of the ACE permits are dated long before the County acquired the SSUS, which was in 2024.  The oldest (Doc. 15-1) is dated

September 27, 2016, while other two (Docs. 15-2 and 15-3) are dated in August 2020 and August 2021, respectively, and address requests for modification.  The most recent is dated some three years before the County's acquisition of the SSUS, and the County has obviously submitted no request for modification specifically related to the County's intention to reef or "scuttle" the SSUS.

Importantly, the oldest permit (Doc. 15-1) notes the following: "This permit does not obviate the need to obtain other Federal, State, or local authorizations required by law." *Id*. at pdf page 8 of 24 (under heading 2(a)).

It is thus by no means clear that the ACE has been made aware by the County of any NHPA section 106 obligations that it or another agency may have.  There is nothing in any of the permits to indicate that vessels that are on the National Register of Historic Places (as the SSUS is) may be among those sunk to create artificial reefs.

Questions regarding whether and to what extent NHPA section 106 confers a private right of action, and what the various Circuit Courts of Appeal have held in that regard, are complex and beyond the scope of this opposition to a motion to dismiss, especially given that the County's

position in its moving papers is that *no NHPA section 106 considerations apply at all.* A relatively recent law review article, however—Daniel E. Walker, "A Statute Without Teeth: Is a Private Right of Action in the National Historic Preservation Act Necessary for Meaningful Cultural Resource Protection?" 44 Vermont Law Review 379 (2019)—addresses some of these questions in considerable depth.

## **FURTHER AMENDMENT**

Lastly, the County argues, Doc. 16 at 31, that "any additional amendment would be futile, and Plaintiff's attempted claims should be dismissed with prejudice." But given the foregoing open questions relating to the County's compliance with NHPA section 106, Plaintiff must respectfully disagree with that proposition. It may be that the ACE is an appropriate and/or necessary party and should be joined. Also, the lack of any discovery whatsoever to date has prejudiced Plaintiff's ability to prosecute its claims effectively.

## CONCLUSION

For all of the foregoing reasons, Defendant's motion to dismiss this action should be DENIED and this Court should grant Plaintiff such additional relief as is just and proper.

Respectfully submitted this 11th day of June, 2025.

*/s/ James M. Maloney*
JAMES M. MALONEY
Attorney for Plaintiff
NEW YORK COALITION TO
SAVE THE STEAM SHIP
UNITED STATES, INC.
33 Bayview Avenue
Port Washington, NY 11050
(516) 767-1395
maritimelaw@nyu.edu

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed with the U.S. District Court, Northern District of Florida, via the CM/ECF system, which will also serve a copy to all counsel of record, on this 11th day of June, 2025.

*/s/ James M. Maloney*
ATTORNEY

## LOCAL RULE 7.1(F) CERTIFICATION

I HEREBY CERTIFY that this memorandum contains 5,400 words, excluding the case style and certifications.

*/s/ James M. Maloney*
ATTORNEY

26