**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**NEW YORK COALITION TO SAVE**
**THE STEAM SHIP UNITED STATES INC,**

     **Plaintiff,**

**v.**                                                **CASE NO. 3:25cv212-MCR-HTC**

**OKALOOSA COUNTY FLORIDA,**

     **Defendant.**

_____/

## ORDER

Plaintiff, the New York Coalition to Save the Steam Ship United States, Inc.
("NY Coalition"), filed suit to prevent Defendant Okaloosa County, Florida, from
dismembering, destroying, and sinking the Steam Ship United States ("SS United
States") for use as an artificial reef in the coastal waters off the shores of Okaloosa
County.  The County moves to dismiss the Amended Complaint for lack of standing
and failure to state a claim.  ECF No. 16; *see* Fed. R. Civ. P. 12(b)(1), (6).  Having
reviewed the motion, the response, ECF Nos. 22, 23, and the County's reply, ECF
No. 26, the Court concludes that NY Coalition cannot establish Article III standing,
and its case must be dismissed for lack of subject matter jurisdiction.

## I.    Background

The County currently holds title to the SS United States.[1]    After taking possession of the vessel on August 27, 2024, the County moved the ship to Mobile, Alabama, to begin necessary preparations for its eventual sinking as an artificial reef off the shores of Okaloosa County, Florida.  The County has permits from the United States Army Corps of Engineers authorizing it to establish "Large Area Artificial Reef Sites" in three designated areas and to sink, among other materials, heavy gauge ferrous and aluminum alloy metal-hulled vessels at authorized depths with certain maximum height restrictions.[2]  The initial permit was issued in September 2016 and requires project completion by March 10, 2026.  The NY Coalition filed this suit to

---

[1] The facts are taken from the Amended Complaint and attachments incorporated into the pleading by reference, *see* ECF No. 12, and through judicial notice, *see* Note 2.

[2] The County asks the Court to take judicial notice of permits issued to it by the United States Army Corps of Engineers authorizing the creation of artificial reefs in the Gulf by sinking vessels of this type, ECF No. 15 (and exhibits).  The motion is unopposed.  Judicial notice allows a court to consider material outside the pleadings without converting a motion to dismiss into a motion for summary judgment only if the material constitutes "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Because the permits in the County's custody can be accurately and readily determined from the United States Army Corps of Engineers records and cannot reasonably be questioned, *see id*., the Court takes judicial notice of them.  These permits state that the Army Corps of Engineers has reviewed the impact on navigation and the environment from the proposal and found it insignificant.  The NY Coalition argues in opposition to the motion to dismiss that the Army Corps of Engineer permits were issued years before the County took title to the SS United States and thus did not contemplate sinking a vessel on the National Register of Historic Places.

delay the preparations for sinking and force the County to seek an additional permit before dismantling the ship's superstructure.

Touting the ship's historic value and significance, the NY Coalition explains that the SS United States was designed as a luxury passenger ocean liner that could be converted to transport troops, and it was constructed in the early 1950s in large part with federal funds through a public-private partnership. The Amended Complaint describes the SS United States as "the flagship of the American merchant marine." ECF No. 12 ¶ 21. The ship launched a maiden voyage in 1952, was decommissioned in 1969, and was thereafter owned by various private entities. It was added to the National Register of Historic Places in 1999. From 2003–2011, the SS United States was owned by Norwegian Cruise Line, which attempted to redevelop it as a cruise ship but eventually abandoned the effort and listed it for sale as scrap. Ownership was transferred to a nonprofit corporation titled the S.S. United States Conservancy in 2011.[3] However, after a dispute arose over the berthing charges at Pier 82 in Philadelphia—where the ship had been docked for nearly 30 years—the Conservancy entered a purchase agreement with the County in August 2004 that included transfer of ownership.[4]

---

[3] The Conservancy was dedicated to raising public awareness of the SS United States' historical significance and to preserving its fixtures. ECF No. 12–3. It is not a party to this litigation.

[4] The Conservancy had been paying berthing charges to Penn Warehousing & Distribution Inc. ("PWD"), which leased Pier 82 from the Philadelphia Regional Port Authority. In 2021, after

On October 28, 2024, two months after the County took ownership, the NY Coalition was formed as a New York nonprofit corporation for the specific purpose of preventing the County from dismantling and sinking the SS United States. Its three directors are James S. Kaplan, who has been actively involved in the preservation of historic landmarks in New York City for 35 years; Dan McSweeney, who was previously a member of the Conservancy; and John Quadrozzi, Jr., who owns a pier in New York capable of accommodating the SS United States.[5] On February 10, 2025, the NY Coalition wrote a letter to the President of the United States, requesting that the Executive Branch institute eminent domain proceedings to take the ship for public use and preserve it as an historic site. The Executive Branch has not responded to the letter. According to the Amended Complaint, the County failed to seek review of its proposal to use a ship on the National Register of Historic Places as an underwater reef by any appropriate federal agency under the National Historic Preservation Act of 1966 ("NHPA").[6]

---

the PWD doubled the daily charge, a dispute over payment ensued, and the PWD demanded that the ship be moved from the pier by March 26, 2022. After a bench trial in the Eastern District of Pennsylvania, the district judge terminated the contractual relationship between the Conservancy and the PWD and required the ship to depart Pier 82 within 90 days, which it did. *See* ECF No. 12-3 (ruling dated June 14, 2024).

[5] According to the Amended Complaint, since 2015, Quadrozzi has pledged to provide a berthing space for the SS United States at no cost to its owner (at that time, the Conservancy), but "[f]or whatever reason, the Conservancy failed to take advantage" of the offer, which still stands. ECF No. 12 ¶ 18.

[6] The Amended Complaint asserts that "[c]ourts have recognized the ability [of] private citizens to seek NHPA review through civil actions," but does not purport to state a cause of action pursuant to NHPA. *See* ECF No. 12 ¶57. The Eleventh Circuit has not decided whether NHPA

The NY Coalition asserts two causes of action in this case. The first sounds in equity, seeking a delay to prevent the County from dismantling the SS United States until the Executive Branch and federal agencies have time to consider whether to act. The second asks the Court to require the County to seek a permit under the Marine Protection, Research and Sanctuaries Act ("MPRSA"), also known as the Ocean Dumping Act, *see* 33 U.S.C. § 1400, *et. seq*, before removing the ship's stacks and superstructure.

## II. Discussion

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am*., 511 U.S. 375, 377 (1994). The fundamental limit on judicial power found in Article III of the United States Constitution requires a case or controversy, which in turn is cabined by the standing doctrine. *See Gardner v. Mutz*, 962 F.3d 1329, 1338 (11th Cir. 2020) ("[T]he standing doctrine is an essential and unchanging part of the case-or-controversy requirement." (quoting *Lewis v. Governor of Ala*.,

---

creates a private cause of action or only allows review of agency action under the Administration Procedure Act, and cases from other circuits can be found on either side of the issue. *See Edgerton v. City of St. Augustine, Fla*., No. 3:20-cv-941-BJD-PDB, 2023 WL 4687563, at *29 (M.D. Fla. Jan. 31, 2023) (collecting cases), *report and recommendation adopted*, No. 3:20-CV-941-BJD-PDB, 2023 WL 4687515 (M.D. Fla. Mar. 20, 2023). Courts agree, however, that the plain language of NHPA is directed to federal agency heads and does not hold non-federal agencies liable for violations. *See id.* (collecting cases); *see also See City Of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1356 (11th Cir. 2005) ("NHPA imposes purely procedural requirements"). The NY Coalition acknowledges that it makes no claim to rights under the NHPA but states it raised this "as part of a broader discussion about the fate of the vessel and the County's duty, as a public entity, to the United States and the American people as a whole." ECF No. 22 at 5-6.

944 F.3d 1287, 1296 (11th Cir. 2019) (*en banc*)).  And because standing is a jurisdictional prerequisite, it must be addressed as a threshold matter before considering arguments on the merits of the claims.

Standing has three irreducible and essential elements: (1) an injury in fact; (2) a causal connection between the injury asserted and the defendant's conduct; and (3) a likelihood that a favorable decision will prevent or redress the injury.  *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992).  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical."  *See id*. at 560 (internal quotations, citations, and footnote omitted).  An injury is only concrete when it is "*de facto*" and "real," not merely "abstract."  *See Gardner*, 962 F.3d at 1341.  A plaintiff cannot be a "concerned bystander" seeking "vindication of value interests."  *Id.* at 1342 (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013)); *see also Food & Drug Admin. v. All. for Hippocratic Med*., 602 U.S. 367, 395 (2024) (stating "a general legal, moral, ideological, or policy objection to a particular government action" does not establish standing).  Instead, the plaintiff must have been "directly affected apart from his special interest in the subject at issue."  *Gardner*, 962 F.3d at 1342 (quoting *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004)).  Consequently, when the plaintiff itself is not the object of the government action or inaction challenged, "standing is not precluded, but it is ordinarily

substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (internal quotations omitted).

An organization may have standing to sue on its own behalf by showing it has sustained injuries. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 & n.19 (1982) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). But frustration of the organization's purpose alone is not enough. In *Havens*, for instance, the plaintiff organization identified injury by alleging that the defendant's discriminatory racial steering practices impaired the organization's activities and its ability to provide housing counseling and referral services, which caused "a drain on the organization's resources." *Id.* at 379. The Court considered this a concrete and particularized injury, "far more than simply a setback to the organization's abstract social interests." *Id.*; *see also All. for Hippocratic Med.*, 602 U.S. at 395 (explaining that in *Havens*, standing was based on injury to or interference with the organization's "core business activities"). An organization can also demonstrate standing based on injury to its individual members, which requires the pleading to identify the members and allege how they have been harmed. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (organization must "identify members who have suffered the requisite harm").

In support of standing, the NY Coalition insists it has a unique stake in the case because it was formed for the express purpose of saving the SS United States

and the sinking or destruction of the ship will terminate the very reason for its existence.  The NY Coalition also argues that, while it is not a member organization, its three directors each share a deeply personal interest in the historic preservation of the vessel.  None of these arguments hold water because, as discussed below, neither the NY Coalition itself nor any of its directors identified an injury to a legally protected interest.

When the County took title in August 2024, the ship's fate as an artificial reef was already sealed.[7]  The NY Coalition was formed *two months later* for the express purpose of interfering with the County's intended and authorized use for the ship. Even the NY Coalition itself acknowledges that creating an organization for the purpose of generating standing to sue can be seen as a type of "bootstrapping," ECF No. 22 at 17.  The Court could not have said it better.  Because the threatened existential injury to the organization and frustration of its purpose was apparent *before* the organization was formed, the NY Coalition is essentially asserting a manufactured and self-inflicted injury.  That does not establish standing.  *See generally Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402, 418 (2013) (holding that "manufactured" or "self-inflicted injury" did not give rise to Article III standing); *Swann v. Sec'y, Georgia*, 668 F.3d 1285, 1288 (11th Cir. 2012) ("[L]ikewise a

---

[7] There is no dispute that the County had obtained title to the vessel and had pre-existing permits from the Army Corps of Engineers allowing it to sink this type of material as an artificial reef.

controversy is not justiciable when a plaintiff independently caused his own injury."); *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (an organization's self-inflicted harm does not amount to an "injury cognizable under Article III" nor is it "fairly traceable" to the defendant's conduct).

Moreover, the NY Coalition lays claim only to a widely shared interest in historic preservation, which is not a legally protected interest. Time and again the Eleventh Circuit has held that preserving history or ascribing a social meaning or value to an object without more is "simply too 'abstract' to implicate Article III." *Gardner*, 962 F.3d at 1341 (endorsing some meaning ascribed to a public historical monument that aligned with the plaintiff's values did not show a concrete injury); *see also Ladies Mem'l Ass'n, Inc. v. Pensacola,* 34 F.4th 988, 993 (11th Cir. 2022) (finding a general disagreement over removing a cenotaph, vague allegations of harm to the preservation of Florida history, or that "the plaintiffs ultimately [were] sad" about removal of the monument insufficient to give rise to standing). While there can be limited circumstances "where a harm is concrete, though widely shared," *Fed. Elec. Comm'n v. Akins*, 524 U.S. 11, 24–25 (1998), this is not one of them. However widely shared, NY Coalition's interest in the historic preservation of this vessel bears no resemblance to the type of legally protected interest and

concrete harm previously found to satisfy standing requirements.[8]   The NY Coalition's lofty claim that it is acting on behalf of the "People of the United States" who have a "federal sovereign interest in 'America's Flagship'" because of its history and the public funding invested into building it in the early 1950s is all sail and no anchor, showing nothing more than a generalized interest that is not cognizable under Article III.

The NY Coalition's directors similarly assert interests too abstract to satisfy Article III.[9]   While these individuals are identified in the Amended Complaint and have demonstrated a genuine interest in historic preservation efforts, completed projects to preserve other landmarks for public benefit, identified an emotional connection to the vessel, and even shown a desire to donate pier space, they remain bystanders—sharing a public sentiment toward the ship but lacking a real or legally protected personal stake in the matter.  *See Gardner*, 962 F.3d at 1341 (noting it is not enough to be a "concerned bystander" seeking "vindication of value interests"); *see also Lujan*, 504 U.S. at 563 ("the 'injury in fact' test requires more than an injury

---

[8] For instance, in *Akins*, the Supreme Court considered whether standing could be based on a statute that sought to protect individuals from the harm of failing to receive particular information about campaign-related activities.   524 U.S. at 24–25.   The Court determined that "the informational injury" was "directly related to voting, the most basic of political rights" and that it was "sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts."  *Id.*   No such fundamental or statutory right is at issue here.

[9] The NY Coalition is a corporation, not a member-based organization.

to a cognizable interest.  It requires that the party seeking review be himself among the injured.").

Further, even if the NY Coalition had a protected interest, the Amended Complaint also suffers from a redressability issue.  The NY Coalition seeks only to buy time to convince *others* to act—the Executive Branch, a federal agency, or even Congress—notwithstanding the County's ownership of the vessel and the previous passage of over 30 years with no Executive or Congressional action.  The ship's preservation would still ultimately be left to actions by those third parties, as the Amended Complaint seems to recognize.[10]

Finally, while the Amended Complaint concedes that the ship is not a party *in rem* to this action, it nonetheless urges that general maritime law's "doctrine of personification" supports recognizing the ship's interest and finding that the ship is "the sole individual beneficiary of this equity action."  ECF No. 12 at ¶ 3.  According to the NY Coalition, this circumstance presents "a unique and dire situation" that is "crying out for the sort of equitable intervention that perhaps only a court sitting in admiralty *could* offer."  ECF No. 22 at 9 (emphasis in original).  But the Court cannot

---

[10] The NY Coalition filed a notice of supplemental authority, including a recent Supreme Court case reaffirming that federal courts have flexible (albeit not "freewheeling") equitable authority encompassing "those sorts of equitable remedies traditionally accorded by courts of equity at our country's inception."  *Trump v. CASA, Inc.*, 606 U.S. --, 145 S. Ct. 2540, 2551 (June 27, 2025), ECF No. 27-1.  Also included is an Oregon Senate "Joint Memorial" urging the President, the Maritime Administration, and Congress to purchase the ship and designate it as a national landmark, ECF No. 27–2.  Neither authority, however, supports NY Coalition's standing.

create standing or jurisdiction unmoored to the facts. Maritime's fictional personification doctrine does not supply standing for *anyone* to sue on behalf of a vessel with merely a vague interest in it (as opposed to having an ownership interest or a contract or tort claim against the vessel). The NY Coalition provides no reasoning as to "how it could become the vessel's agent without [the County's] approval as the vessel's owner." *D & M Carriers LLC v. M/V Thor Spirit*, 586 F. App'x 564, 569 n.7 (11th Cir. 2014) (discussing a maritime lien). Absent a legally protected interest in, or claim against, the ship, this maritime doctrine is unavailable.

Because the NY Coalition lacks constitutional standing, the Court does not have subject matter jurisdiction, and there is no need to consider the arguments under Rule 12(b)(6).

Accordingly:

1.    The County's Unopposed Request for Judicial Notice, ECF No. 15, is **GRANTED**.

2.    The County's Motion to Dismiss, ECF No. 16, is **GRANTED** and the case is **DISMISSED** without prejudice for lack of subject matter jurisdiction.

3.    The Clerk is directed to enter judgment accordingly and close the file.

**DONE and ORDERED** this 6th day of August 2025.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

CASE NO. 3:25cv212-MCR-HTC