## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

NEW YORK COALITION TO
SAVE THE STEAM SHIP
UNITED STATES, INC.

    Plaintiff,

vs.                                      Case No. 3:25-cv-00212-MCR-HTC

OKALOOSA COUNTY, FLORIDA

    Defendant.

_____ /

## OKALOOSA COUNTY, FLORIDA'S MOTION FOR SANCTIONS AND INCORPORATED MEMORANDUM OF LAW

Defendant, OKALOOSA COUNTY, FLORIDA (the "County"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 11, requests this Court enter an order imposing sanctions upon Plaintiff's counsel for filing Plaintiff's Amended Civil Complaint (Doc. 12) and continuing to prosecute Plaintiff's frivolous claims against the County. In support, the County states as follows:

1.    On March 2, 2025, Plaintiff filed suit against the County, requesting this Court award "appropriate transient relief" and prohibit the County from using or working on its tangible property, *i.e.*, a passenger ship named the S.S. United States. (Doc. 1).

2.    The County moved to dismiss Plaintiff's Complaint, with prejudice, arguing Plaintiff lacked standing to assert its singular claim and, even so, Plaintiff had not and could not state a cause of action for which any relief could be granted. (Doc. 10).

3.    In lieu of opposing the County's Motion to Dismiss, Plaintiff notified the Court of its intent to amend its pleading (Doc. 11), and on April 18, 2025, Plaintiff filed its Amended Civil Complaint (Doc. 12). Plaintiff's counsel, James M. Maloney, signed the Amended Complaint.

4.    The Amended Complaint now attempts to state two causes of action: one with no legal basis and one refuted by the plain language of the relied-upon statutes. First, Plaintiff asks this Court to prohibit the County from conducting certain remediation activities on the vessel until the United States Government has a "reasonable opportunity" to consider whether to exercise its power of eminent domain over the tangible property and to "address [a] question" concerning the interplay between two Federal statutes. (Doc. 12, ¶¶ 47, 61). Second, Plaintiff asks this Court to require the County seek a Federal permit before conducting planned remediation activities on the vessel. (Id., ¶ 63).

5.    Plaintiff's Amended Complaint is objectively frivolous and fails to remedy the fatal flaws of the previous Complaint. Plaintiff still lacks standing, and

there exists no Federal, State, or common law basis supporting Plaintiff's extraordinary and unusual requests for relief. On the whole, Plaintiff's Amended Complaint is based upon legal theories that have no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law.

6.     Moreover, Plaintiff's Amended Complaint was filed in bad faith and for an improper purpose: to delay the County from utilizing its tangible property as it desires in the hope that a non-party decides to take up Plaintiff's cause.

7.     The County has incurred, and continues to incur, attorneys' fees and costs defending this frivolous lawsuit.

8.     Therefore, the County requests an imposition of sanctions upon Plaintiff's counsel, pursuant to Federal Rule of Civil Procedure 11.

9.     In accordance with Rule 11, the County electronically served a letter and a copy of this Motion upon Plaintiff's counsel on May 23, 2025.[1] The County waited the required twenty-one (21) days for Plaintiff to dismiss the Amended Complaint before filing this Motion, pursuant to Federal Rules of Civil Procedure 5 and 11(c)(2).

---

[1] As provided by Federal Rule of Civil Procedure 5(b)(2)(F), the parties consented in writing for service of any future pleading or paper to be accomplished, among other ways, by electronic mail delivery. (See Doc. 14, p. 4, § 4.J.).

## MEMORANDUM OF LAW IN SUPPORT OF SANCTIONS

### I.     BACKGROUND.

This case stems from the County's acquisition of a ship, the SS United States. For decades leading up to the County's purchase, the vessel languished in a Philadelphia port and suffered irreparable damage. In March 2022, the Philadelphia pier operator sued the vessel's prior owner, The SS United States Conservancy (the "Conservancy"), in an action pertaining to a berthing services agreement between the two entities. (See Doc. 12-3). Following a bench trial, the Court issued its order in June 2024, which among other things, required the ship be removed from the Philadelphia pier by September 12, 2024. (Id.). Then, the County stepped in.

In August 2024, the Conservancy and the County entered into a Purchase and Sale Agreement, which was subsequently approved by the Okaloosa County Board of County Commissioners on October 1, 2024. (Doc. 12-4). The Agreement stipulated that the County would purchase the vessel from the Conservancy to convert the liner into the world's largest artificial reef. (Id.). The County would also provide the Conservancy with $1,000,000.00 for the creation of a permanent, land-based museum located in Okaloosa County to celebrate the history of the vessel. (Id.). Apparently unsatisfied with the County's purchase and plans, Plaintiff

incorporated itself, under the laws of the State of New York, for the purpose of preventing the sinking or destruction of the vessel. (Doc. 12, ¶ 1).

Prior to the County's planned reefing, the ship would undergo extensive cleaning and remediation, including being stripped of all non-metal components, oil, and harmful chemicals, to ensure it passed regulatory inspections and was environmentally safe. After purchasing the ship, in February 2025, the County transported the vessel from Philadelphia to a shipyard in Alabama where remediation work began to prepare the ship for sinking, including removal of its twin smokestacks and other parts of the ship's superstructure.

While transport was underway, on February 10, 2025, Plaintiff wrote to the United States Government and requested the Government to take "executive action by ordering the taking of [the SS United States] for public use." (Doc. 12-1). As of filing its Amended Complaint on April 18, 2025, Plaintiff did not know "whether the Executive Branch of the United States [was] even aware of the [] Letter, let alone whether it [was] being considered." (Doc. 12, ¶ 9). Nevertheless, Plaintiff forged ahead.

Plaintiff's amended pleading asks two things of this Court: (1) that the Court impose "appropriate equitable relief"—*i.e.*, prohibiting the County from removing the vessel's smokestacks and "other parts of her superstructure" for "relatively short

and eminently reasonable" 90 days (Doc. 12, ¶¶ 11, 13, 49, 61); and (2) that the Court require the County seek a permit under the Marine Protection, Research and Sanctuaries Act ("MPRSA" or "Ocean Dumping Act") *prior* to removing the smokestacks and other parts of the ship's superstructure (Id., ¶ 63). Both requests lack merit and precedent.

## II.    LEGAL STANDARD.

Every pleading submitted on behalf of a represented party must be signed by at least one attorney of record in the attorney's name. Fed. R. Civ. P. 11(a). "When an attorney files a pleading in federal court, the attorney signs the pleading to certify that, among other things, (1) the pleading is not being presented for an improper purpose; (2) the legal contentions are warranted by existing law or a nonfrivolous argument to change existing law; and (3) the factual contentions have evidentiary support or will likely have evidentiary support after discovery." Peer v. Lewis, 606 F.3d 1306, 1311 (11th Cir. 2010) (citing Fed. R. Civ. P. 11(b)). Rule 11 is designed to "discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses." Fed. R. Civ. P. 11 Advisory Comm. Note (as amended in 1983); see also Peer, 606 F.3d at 1311.

If, after notice and an opportunity to respond, the Court determines a filing violates Rule 11(b), the Court may impose an "appropriate sanction" on any

attorney, law firm, or party that violated the Rule or caused its violation. Fed. R. Civ. P. 11(c)(1); 11(c)(4). Thus, the goal of sanctions under Rule 11 is to "reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers." Massengale v. Ray, 267 F.3d 1298, 1302 (11th Cir. 2001) (internal quotation and citation omitted).

Rule 11 sanctions are appropriate in three circumstances:

> (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) when the party files a pleading in bad faith for an improper purpose.

Didie v. Howes, 988 F.2d 1097, 1104 (11th Cir. 1993).

### III.   PLAINTIFF'S AMENDED COMPLAINT VIOLATES RULE 11.

When evaluating a motion for Rule 11 sanctions, courts consider "(1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous." Baker v. Alderman, 158 F.3d 516, 524 (11th Cir. 1998). As for the first prong, a legal claim is objectively frivolous if no competent attorney (or *pro se* litigant) would have concluded it had a reasonable chance of success or involved a reasonable argument to change the law. Woodhull v. Mascarella, No. 1:15-cv-280-MW-GRJ, 2016 U.S. Dist. LEXIS 86912,

*5, 2016 WL 3660527 (N.D. Fla. May 26, 2016) (citing <u>Worldwide Primates, Inc.</u> <u>v. McGreal</u>, 87 F.3d 1252, 1254 (11th Cir. 1996)), *report and recommendation* *adopted*, 2016 U.S. Dist. LEXIS 86903 (N.D. Fla. July 5, 2016), *affirmed*, 699 F. App'x 872 (11th Cir. 2017), *cert. denied*, 585 U.S. 1018 (2018). As for the second, a court must determine "whether the person who signed the pleadings should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry." <u>Worldwide Primates</u>, 87 F.3d at 1254. "The objective standard for testing conduct under Rule 11 is 'reasonableness under the circumstances' and 'what was reasonable to believe at the time' the pleading was submitted." <u>Baker</u>, 158 F.3d at 524 (internal citations omitted).

## A. Plaintiff's Amended Complaint is Objectively Frivolous.

A factual claim is frivolous when it has no reasonable factual basis. <u>Gulisano</u> <u>v. Burlington, Inc.</u>, 34 F.4th 935, 942 (11th Cir. 2022). A legal basis is frivolous when it has no reasonable chance of success. <u>Id.</u> "When the attorney's evidence is 'merely weak,' but supports a claim under existing law after a reasonable inquiry, sanctions are unwarranted. Sanctions are warranted, however, when the attorney exhibits 'a deliberate indifference to obvious facts.'" <u>Id.</u> (internal citations omitted).

### i.    Plaintiff's Amended Complaint is Frivolous Because Plaintiff Lacks Standing to Prosecute its Claims.

As a threshold matter, Plaintiff's Amended Complaint is objectively frivolous because Plaintiff should have known it lacked Article III standing to prosecute its claims against the County. Even though the County, through a Motion to Dismiss (Doc. 10), apprised Plaintiff of its failure and inability to establish standing, Plaintiff still ignored the basic tenets of standing and filed its Amended Complaint incorporating the same fatal flaws: lack of concreteness and lack of particularity.

One of the three requirements Plaintiff must show to establish standing is a demonstrable injury in fact. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). To establish an injury in fact, Plaintiff "must show that [it] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016) (quoting Lujan, U.S. 504 at 560). An organization may have standing to sue on its own behalf for injuries it has sustained. Havens Realty Corp. v. Coleman, 455 U.S. 363, 379, n.19 (1982). Alternatively, an organization must show standing through the standing of its members, which requires the plaintiff to identify its members and allege how those members have been harmed. See Summers v. Earth

Island Inst., 555 U.S. 488, 499 (2009) ("identify members who have suffered the requisite harm"). Plaintiff's Amended Complaint does neither.

### a.    Concreteness

As this Court has explained, for an injury to be concrete, it must be "'de facto' and 'real,' not merely 'abstract.'" Ladies Mem'l Ass'n v. City of Pensacola, No. 3:20cv5681-MCR-EMT, 2020 U.S. Dist. LEXIS 160071, at *7, 2020 WL 5237742 (N.D. Fla. Sep. 2, 2020) (referencing Gardner, 962 F.3d at 1341). "Moreover, purely psychic injuries arising from disagreement with government action do not meet the concreteness requirement." Id. (quotation and citations omitted).

In its Amended Complaint, Plaintiff simply disagrees with and objects to the County's actions in preparing its ship to be reefed. Plaintiff takes issue with the County's plans based upon the vessel's historical relevance to the Plaintiff's individual members, who would rather "preserve the vessel afloat, restore her, and make her a welcome site for the public to visit." (Doc. 12-1) (cleaned up). Plaintiff further considers its efforts to preserve the SS United States as "not just a matter of preserving a historic vessel [but] about honoring the legacy of American Greatness and of the many who traveled on the vessel." (Id.). However, this vague and abstract

difference in opinion between Plaintiff and the County about the best use of the County's property does not give rise to a concrete injury suffered by Plaintiff.

In Gardner v. Mutz, the United States Court of Appeals for the Eleventh Circuit considered a similar case in which several individuals and organizations filed suit and objected to the removal of a Confederate monument by a municipality. Gardner, 962 F.3d at 1333. Those plaintiffs claimed that the removal of the monument infringed on their interests in preserving Southern history, vindicating the cause for which Confederate veterans fought, and protecting memorials to American Veterans. Id. at 1341. In affirming dismissal, the Eleventh Circuit determined that the plaintiffs' claimed injuries were "pretty amorphous" and "simply too abstract" to establish a concrete injury in fact.[2] Id. The appellate court further explained that merely disagreeing with the removal of the monument "does not alone give rise to a concrete injury for Article III purposes." Id.

Like the plaintiffs' claimed injuries in Gardner, which the Eleventh Circuit considered too abstract and amorphous, so too are Plaintiff's claimed injuries in this case. Plaintiff's simple disagreement with the County's decision to create an

---

[2] The appellate court affirmed the trial court's without-prejudice dismissal of one claim. As to the other claim, the appellate court vacated the trial court's with-prejudice dismissal and instructed the trial court to dismiss that claim without prejudice.

artificial reef, despite the vessel's historical relevance, does not amount to any concrete injury to the Plaintiff. See Gardner, 962 F.3d at 1341("[W]hile a concrete injury needn't necessarily be 'tangible,' the Court has consistently held that purely psychic injuries arising from disagreement with government action—for instance, 'conscientious objection' or 'fear'—don't qualify.") (internal citations omitted).

###     b.     Particularity

As to particularity, Plaintiff's purported injury must be distinct—rather than undifferentiated—to it, and Plaintiff must demonstrate it has "been directly affected apart from [its] special interest in the subject at issue." Gardner, 962 F.3d at 1342. (internal quotation omitted). The "test requires more than an injury to a cognizable interest;" it "requires that the party seeking review be [itself] among the injured." Lujan, 504 U.S. at 563. An injury is not particularized when the plaintiff is asking the court to "decide questions of broad social import that are shared by other citizens in equal measure." Garcia-Bengochea v. Carnival Corp., 57 F.4th 916, 923 (11th Cir. 2023) (internal citation omitted).

In Gardner, in addition to determining the plaintiffs who objected to the memorial's removal failed to set forth any concrete injury, the Eleventh Circuit also determined that the plaintiffs failed to allege any particularized injury. Gardner, 962 F.3d at 1341–42. The plaintiffs' "special interest in the subjects of Confederate

history, veterans memorials, and the so-called 'Southern perspective'" did not amount to a particularized injury. Id. at 1342 (quotation omitted). "[G]eneralized desires to promote Southern history and to honor Confederate soldiers" did not distinguish the plaintiffs from other interested observers, and thus did not give rise to a particularized injury to confer standing. Id. at 1342–43.

Much like the Gardner plaintiffs' general interest in preserving Southern history, Plaintiff's general interest in preserving the SS United States and its history does not give rise to a particularized injury to invoke standing. Nor does Plaintiff's desire to "honor[] the legacy of American Greatness and of the many who traveled on the vessel." (Doc. 12-1). With its generalized interests in preservation and commemoration being undifferentiated from those of any other interested observers, Plaintiff is merely a "concerned bystander[] attempting to vindicate [its] value interests." Gardner, 962 F.3d at 1343. With nothing more, Plaintiff has not demonstrated a particularized injury, which is a required showing to establish standing. The County thoroughly apprised Plaintiff of these legal authorities (see Doc. 10), yet Plaintiff, through its counsel, was deliberately indifferent to binding Circuit precedent and, nonetheless, has proceeded with its claims against the County.

### c.    Organizational Injury

Notwithstanding the absence of concreteness and particularity, Plaintiff and its counsel should have known Plaintiff could not establish either organizational injury or associational standing. Plaintiff filed its Amended Complaint on its own behalf because "the sinking or other destruction of the [vessel] would irrevocably and permanently terminate the very reason for the [Plaintiff's] existence." (Doc. 12, ¶ 15). More specifically, the "primary purpose of [the suit is to] prevent the historic ocean liner . . . from being sunk, dismembered, or destroyed." (Id., ¶ 1). That is the extent of Plaintiff's perceived injury, and that is insufficient to establish an organizational injury-in-fact.

"[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by [Article] III." Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 (1976). An organizational plaintiff must show "far more than simply a setback to the organization's abstract social interests." FDA v. All. for Hippocratic Med., 602 U.S. 367, 394 (2024) (citing Havens, 455 U.S. at 379).

Here, Plaintiff attempts to allege standing by positing an existential crisis, in the event the County utilizes its tangible property in a manner with which Plaintiff disagrees. But hyperbole and hypotheticals do not suffice to establish standing, for

14

"[l]ike an individual, an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization." Hippocratic Med., 602 U.S. at 394 (internal quotations and citations omitted). Plaintiff's Amended Complaint fails to establish Plaintiff's standing because Plaintiff fails to allege that it has or will suffer a cognizable injury-in-fact.

### d.    Associational Standing

Plaintiff's Amended Complaint also attempts, and fails, to demonstrate associational standing. When an association sues on behalf of its members, the association need not show that it has suffered an injury-in-fact. See Warth v. Seldin, 422 U.S. 490, 511 (1975). Instead, the association may demonstrate representational associational standing by showing (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. See Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977); see also Warth, 422 U.S. at 511.

In support of its associational standing, Plaintiff avers that "[s]ome or all of the Coalition's members . . . would otherwise have standing to sue in their own right," and Plaintiff further contends that even though "the interests of the three

directors each arise out of separate and distinct bases [they] combine synergistically within the framework of the organization (i.e., the sum is greater than its parts combined)." (Doc. 12, ¶ 20). Though all of Plaintiff's directors possess backgrounds in the realm of historical and cultural preservation, none has standing to sue in his own right because none has suffered or will suffer any particularized or concrete injury if the County is permitted to continue its vessel remediation efforts.

Plaintiff summarily claims director James S. Kaplan has a personal stake in the fate of the SS United States that differs from that of the general public. (Doc. 12, ¶ 16). Though Mr. Kaplan's background and accomplishments are commendable, neither relates directly or indirectly to the SS United States. And any "personal stake in the fate of the SS United States," as set forth in the Amended Complaint, is too general and vague to confer standing. Mr. Kaplan's generalized interest in preserving the SS United States fares no better than those plaintiffs in Gardner, who alleged a "special interest in the subjects of Confederate history, veterans memorials, and the so-called 'Southern perspective,'" and which the Eleventh Circuit Court of Appeals found to be "too vague, inchoate, and undifferentiated" to establish standing. Gardner, 962 F.3d at 1343.

As for another director, John Quadrozzi, Plaintiff asserts "his personal, long-term pecuniary, and public-benefit interests would be irreparably harmed were [the

vessel] to be sunk [or] otherwise rendered incapable of being preserved afloat." (Doc. 12, ¶ 18). Mr. Quadrozzi's vague, alleged interests are no more concrete or particularized than those of Mr. Kaplan. Mr. Quadrozzi's willingness to provide berthing space at a terminal in New York,[3] of which he is the "beneficial owner," provides no basis for any claimed concrete or particularized injury. Assertions that Mr. Quadrozzi's personal, long-term pecuniary, and public-benefit interests would be harmed amount to mere conjecture or hypothetical injury, which cannot confer standing. See Los Angeles v. Lyons, 461 U.S. 95, 101–02 (1983) ("Abstract injury is not enough. The plaintiff must show that he has sustained or is immediately in

---

[3] While Plaintiff claims to lack understanding why the Conservancy declined Mr. Quadrozzi's offer (Doc. 12, ¶ 18), the Conservancy has explained:

> In terms of the New York group which has initiated litigation against Okaloosa County and seeks to bring the ship to New York at a specific pier in Gowanus, Brooklyn, there is history with the Conservancy dating back 10 years. Several hurdles had been identified at the proposed site, and interaction between the parties did not resolve those obstacles or satisfy minimal due diligence. In our urgent search for a temporary pier last year, we revisited this location and concluded that the designated pier could not accommodate the SS United States without major work, [and] that this could not be accomplished within the short, court-ordered timeframe.

SS United States Conservancy, Answers to Frequently Asked Questions, HOW IS THE CONSERVANCY RESPONDING TO OTHER GROUPS' LAST-MINUTE ATTEMPTS TO "SAVE" THE SS UNITED STATES?, https://www.ssusc.org/frequently-asked-questions, last visited May 23, 2025 (also attached hereto as **Exhibit 31-1**).

danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.") (quotation omitted); see also Lujan, 504 U.S. at 561 (holding a required element of standing is that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision") (quotation omitted).

Lastly, as to director Dan McSweeney, Plaintiff states "[Mr. McSweeney's] father was a crew member of SSUS. Because of his sustained and documented efforts relating to preservation of SSUS afloat [*sic*], and his personal relationship to the Ship, Mr. McSweeney's personal stake in the fate of SSUS differs from that of members of the general public." (Doc. 12, ¶ 17). However, Plaintiff fails to adduce any facts showing Mr. McSweeney has or will suffer any concrete and particularized injury that is different from any public sentiment in saving the SS United States. See Edgerton v. City of St. Augustine, No. 3:20-cv-941-BJD-PDB, 2023 U.S. Dist. LEXIS 49055, at *100, n.13, 2023 WL 4687563 (M.D. Fla. Jan. 31, 2023) ("[Familial ties] affect only the magnitude of the plaintiffs' indignation, not the nature of their injury.") (citing McMahon v. Fenves, 946 F.3d 266, 271–72 (5th Cir. 2020)).

18

On the whole, Plaintiff's generalized interest in preserving the history of the SS United States, as well as honoring its greatness and its travelers is nearly identical to the plaintiffs' generalized interests in <u>Gardner</u> and <u>Ladies Memorial Association</u>. Notwithstanding both binding and persuasive precedent to the contrary, Plaintiff, through its counsel, continues to assert it possesses standing to prosecute its claims. However, Plaintiff's interest is unrelated to any injury in fact and, thus, is insufficient to establish Plaintiff's standing. <u>See</u> <u>Stalley v. Orlando Reg'l Healthcare Sys.</u>, 524 F.3d 1229, 1232 (11th Cir. 2008). No competent attorney would have concluded Plaintiff had a reasonable chance of establishing standing or changing existing precedent. This is especially true in light of this Court's determinations in <u>Ladies Memorial</u> and the other binding precedent in this Circuit. Even more troubling, Plaintiff's counsel was or should have been aware of the binding legal authorities because the County cited each in the County's original Motion to Dismiss (Doc. 10).

> **ii.    Count I of Plaintiff's Amended Complaint is Based on a Legal Theory That Has No Reasonable Chance of Success and That Cannot be Advanced as a Reasonable Argument to Change Existing Law.**

Even assuming Plaintiff could establish standing on any basis, Plaintiff has twice failed to articulate any cognizable legal theory on which it is entitled to relief sought under Count I of the Amended Complaint. By extension, Count I has no

19

reasonable chance of success, nor may Count I be characterized as a reasonable argument to change existing law. Stated differently, Plaintiff's Amended Complaint has no reasonable chance of success because Plaintiff fails to state a cause of action entitling it to "a relatively short and eminently reasonable delay" to provide the Executive Branch and appropriate agencies to consider whether to take the vessel for public use. (Doc. 12, ¶¶ 13, 47(a)). Though Plaintiff makes clear the relief it desires, Plaintiff's Amended Complaint fails to state any cognizable cause of action for which such—or any—relief may be granted. Indeed, although admitting "there is no precise precedent for such equitable causes of action," Plaintiff fails to provide any legal basis on which it can maintain its claim under Count I. Plaintiff merely summarily states "such lack of precedent should not be fatal to [its] causes." (Id., ¶ 51).

Plaintiff's Amended Complaint contains no allegations demonstrating any claim for which it is entitled to any relief under Count I. Instead, Plaintiff's Amended Complaint asserts no more than the generic "I will be harmed" if the County is permitted to lawfully use its property as the County wishes. That is simply insufficient to state a claim. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Plaintiff's Amended Complaint references two Public Laws, 92-296 and 94-536, which purportedly evidence the Federal Government's "broad interest…in

retaining [the vessel] afloat and intact well into the future." (Doc. 12, ¶¶ 43–45; Doc. 12-5). Even if true, neither regulation creates a private right of action as to their provisions. Moreover, even if Plaintiff were to allege the County has acted in contravention of those Public Laws, any remedy for such a violation would be afforded to the Federal Government, not Plaintiff. To the extent Plaintiff's Amended Complaint may be read to rely upon the cited Public Laws as a basis for its claim(s), such reliance is misplaced. Plaintiff has not pled, and cannot plead, any claim or cause of action so as to support its request for unusual relief.

###### iii.    Count II of Plaintiff's Amended Complaint is Also Based on a Legal Theory That Has No Reasonable Chance of Success and That Cannot be Advanced as a Reasonable Argument to Change Existing Law.

####### a.    The MPRSA

In its second claim, Plaintiff asks this Court to compel the County to "seek a permit under the MPRSA or Ocean Dumping Act before removal of the stacks and superstructure . . . ." (Doc. 12, ¶ 63). Plaintiff's request is objectively frivolous because it has no reasonable chance of success based upon a plain reading of the MPRSA. For purposes of the MPRSA, "dumping" means "a disposition of material. . . ." 33 U.S.C. § 1402(f). However, an exemption applies when disposition is "for a purpose other than disposal, when such construction or such

placement is otherwise regulated by Federal or State law or occurs pursuant to an authorized Federal or State program." Id. Because the County does not intend to sink the vessel as a means of disposal—a fact Plaintiff does not dispute (see Doc. 12, ¶ 41)—and because Federal law regulates the sinking of the ship to create an artificial reef, the County's activities fall squarely within this exemption from the MPRSA. A simple reading and cursory analysis of this statutory provision would have, and should have, revealed to Plaintiff's counsel that any permitting requirement under the MPRSA would not apply to the County's efforts to sink the ship to transform it into an artificial reef.[4]

In this present case, Plaintiff avers the ship will be sunk for purpose of creating an artificial reef. (Doc. 12, ¶¶ 6, 10, 27, 41). When sinking a vessel for the creation of an artificial reef, permitting authority is delegated to the United States Army Corps of Engineers. 33 C.F.R. § 322.5 ("The Secretary of the Army has delegated to the Chief of Engineers the authority to issue or deny section 10 permits.");[5]

---

[4] It appears Plaintiff's MPRSA argument originated not from any legal authority, but rather from a quote in a college newspaper article. (See Doc. 12, ¶ 6, n.2 (also attached hereto as **Exhibit 31-2**)). If so, Plaintiff's reliance on that person's opinion is both misplaced and not reasonable under the circumstances.

[5] "Section 10" refers to the Rivers and Harbors Appropriations Act of 1899 (i.e., 33 U.S.C. § 403). 33 C.F.R. § 322.1.

see also <u>Lozman v. City of Riviera Beach</u>, 119 F.4th 913, 916 (11th Cir. 2024) ("The

Rivers and Harbors Appropriation Act of 1899 prohibits the excavation, filling, or

modification of the channel of any 'navigable water' of the United States without

the permission of the [United States Army] Corps [of Engineers].") (citing 33 U.S.C.

§ 403).[6] When issuing or denying a permit, the Army Corps of Engineers considers

the siting, constructing, monitoring, operating, maintaining, and managing of the

proposed artificial reef. 33 C.F.R. § 322.5(b).

      Moreover, as evidenced by the documents within the County's Request for

Judicial Notice (Docs. 15, 15-1, 15-2, 15-3), the County has applied for, and the

Army Corps of Engineers has issued, permits authorizing the County to create

artificial reefs by sinking vessels, including the SS United States. (<u>See</u> Doc. 15-2,

pp. 1–2 of 7 ("The Permittee shall deploy only the following authorized reef

materials. . . . Heavy gauge ferrous and aluminum alloy metal hulled vessels which

equal or exceed 60 feet hull length prepared and deployed in accordance with all

applicable U.S. Coast Guard, U.S. Environmental Protection Agency, Florida Fish

---

[6] Plaintiff claims subject matter jurisdiction is based on "this action at its commencement concerned the fate of a vessel in navigation *upon navigable waters* of the United States." (Doc. 12, ¶ 4) (emphasis added).

and Wildlife Conservation Commission, or other applicable state or federal agency regulations or policies.")).[7]

Plaintiff's counsel knew or should have known that the County possessed permits authorizing the County to create an artificial reef. Indeed, a simple public records request to the County would have produced the pertinent documents to Plaintiff. Instead, Plaintiff's counsel was "deliberate[ly] indifferent to obvious facts" when he filed Plaintiff's Amended Complaint raising Count II. See Gulisano, 34 F.4th at 942. At bottom, Plaintiff's counsel failed to conduct a reasonable pre-filing inquiry as to both the facts and the law. And Plaintiff's filing and continued prosecution of its amended pleading has wasted both the Court's limited time and the County's limited financial resources.

---

[7] In the event Plaintiff's pleading could be read as a challenge to the issued Army Corps permit, Plaintiff has failed to demonstrate its standing for such a challenge. When, as in this case, a plaintiff's injury arises from the government's allegedly unlawful regulation of a third party, "much more is needed." Lujan, 504 U.S. at 562. The plaintiff must establish that choices will be made by both the regulator and the regulated party "in such [a] manner as to produce causation and permit redressability of injury." Id. Moreover, a plaintiff bringing suit under the Federal Administrative Procedure Act must demonstrate that its injury-in-fact "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990).

###### b.    The NHPA

Additionally, Plaintiff's Amended Complaint accuses the County of making an "end run" around the National Historic Preservation Act (the "NHPA"). Specifically, Plaintiff claims "Section 106 [of the NHPA][8] mandates that any action that would threaten the future of a federally funded historical object, such as the SSUS, be reviewed by the applicable federal agencies to determine what the best course would be to protect the historical object." (Doc. 12, ¶ 55). However, "the NHPA is directed towards heads of federal agencies and departments, not toward state or municipal officers." Edgerton, 2023 U.S. Dist. LEXIS 49055, at *78 (M.D. Fla. Jan. 31, 2023) (internal citation and quotation omitted). Therefore, it has been consistently determined that non-federal agencies such as the County cannot be held liable for violations of this Act. See id. (collecting cases and explaining that "all courts agree that under the plain language of the NHPA, non-federal agencies are not liable for violations of the NHPA."). Any competent attorney conducting a pre-filing investigation would (or should) have determined that the County could not be liable for violations of the NHPA, for the County is not a Federal agency.

---

[8] Now codified at 54 U.S.C. §§ 300101–307108.

What's more, the NHPA is a "purely procedural" statute, requiring a Federal agency to "take into account" the effect of any "undertaking" on historical sites. <u>City of Oxford v. F.A.A.</u>, 428 F.3d 1346, 1356 (11th Cir. 2005). An "undertaking" is "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including": "those carried out by or on behalf of the Federal agency"; "those carried out with Federal financial assistance"; "those requiring a Federal permit, license, or approval"; and "those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency." 54 U.S.C. §§ 300320, 306108.

Plaintiff erroneously suggests that because the vessel was constructed with use of Federal funds (Doc. 12, ¶ 23), NHPA review must occur. But Plaintiff's contention ignores the plain language of the NHPA. An "undertaking" is a project or activity "funded in whole or in part under the direct or indirect jurisdiction of a Federal agency." While the vessel may have received Federal funding decades ago, Plaintiff's Amended Complaint does not—and cannot—allege that the County's non-federal project and activities are federally funded.

c.    **The National Register of Historic Places**

Finally, Plaintiff's Amended Complaint impliedly suggests the County's creation of an artificial reef is barred because the vessel is listed on the National

26

Register of Historic Places. (See Doc. 12, ¶¶ 6, n.2, 22, n.7, 58). Plaintiff's assertion is meritless. While the vessel may be listed on the National Register of Historic Places, its listing does not restrict the County's use of its property. Indeed, private owners of property on the National Register may remodel, renovate, sell, or demolish their property without limitation. See 36 C.F.R. § 65.2(b) ("Listing of private property on the National Register does not prohibit under Federal law or regulations any actions which may otherwise be taken by the property owner with respect to the property."). Instead, the National Register is used as a planning tool to control the actions of Federal agencies—not private owners—in relation to properties on the Register. Id.; 36 C.F.R. § 65.2(c)(1). With respect to nationally designated private property (e.g., the SS United States), the NHPA does not restrict the rights of private owners such as the County.

Plaintiff's counsel knew or should have known, based upon any pre-filing review or inquiry, that Plaintiff's assertion was devoid of any legal merit. Yet, counsel failed to do so and has, instead, presented a frivolous claim to this Court that is refuted by the plain language of the applicable statutes and regulations.

### B.    Plaintiff's Amended Complaint was Filed in Bad Faith for an Improper Purpose.

Notwithstanding the objective frivolity of Plaintiff's purported causes of action, Plaintiff's Amended Complaint—and its entire suit against the County—was

27

filed for an improper purpose: to delay and prohibit the County from using its property. Plaintiff concedes this point. Plaintiff's desires to "interdict any immediate plans to reef the ship by posing a formal review." (Doc. 12, ¶ 19, n.6).[9] In furtherance of that singular goal, Plaintiff initiated this action to "provide the Executive Branch of the United States reasonable time to decide whether [the vessel] should be taken for public use, with just compensation paid to the County." (Id., ¶ 6). But recognizing both the tenuousness of its position and the improper purpose of its suit, Plaintiff claims that if "the Executive Branch [were] to communicate to this Honorable Court or to Plaintiff its intention *not* to take [the vessel] for public use, Plaintiff would consent to dismissal of [Count I]." (Id., ¶ 48).

Nevertheless, Plaintiff's request for delay is most analogous to a request for injunctive relief. However, Plaintiff's Amended Complaint fails to establish any legal basis authorizing this Court to exercise its equitable authority. Instead, Plaintiff expressly concedes—and the County agrees—its request is unprecedented. (See id., ¶ 51). Plaintiff's stated goal in this litigation is only to allow the United States Government an opportunity to consider exercising eminent domain over the

---

[9] New York Coalition to Save the SS United States, SAVE AN AMERICAN ICON, THE SS UNITED STATES, DON'T DESTROY HISTORY!, https://www.change.org/p/last-call-save-the-ss-united-states-say-no-to-reefing-brooklyn-or-bust, last visited May 23, 2025 (also attached hereto as **Exhibit 31-3**).

County's property. Indeed, Plaintiff's pleading is but one tool used to further Plaintiff's overarching plan to "explor[e], and exhaust[], all possible possibilities to prevent the vessel from being lost to history." New York Coalition to Save the SS United States, FAQs, THE SHIP HAS ALREADY BEEN MOVED OUT OF PHILADELPHIA, ISN'T IT TOO LATE?, https://www.nycsavessus.org/faqs, last visited May 23, 2025 (also attached hereto as **Exhibit 31-4**). Plaintiff's Amended Complaint, however, points to no legal authority authorizing this Court to take such action to "buy time" strictly for the purpose of allowing a non-party to consider whether it should take any action.

Further evidencing Plaintiff's ongoing bad faith, Plaintiff's public statements directly refute Plaintiff's averments in its Amended Complaint. Regarding removal of the vessel's smokestacks, Plaintiff—and its counsel—told this Court that "[i]f those radically eviscerative [*sic*] measures are taken, any hope of preserving the Ship afloat and intact would be lost forever" (Doc. 12, ¶ 11), and "removal of the stacks and superstructure [] will negate the Ship's value as an above-water landmark" (id., ¶ 59). But to its supporters, Plaintiff told a different story. In response to reports that the smokestacks were being prepared for removal, Plaintiff told the public that such removal "doesn't signal the end." New York Coalition to Save the SS United States, DONE THEN, DONE NOW., https://www.nycsavessus.org/the-funnels, last visited

May 23, 2025 (also attached hereto as **Exhibit 31-5**). To keep hope alive, Plaintiff publicly stated, "[i]f the funnels are removed, they can be reattached. *They did it in the 1950s, we can do it in the 2020s*…." Id. (emphasis in original). And "in the unfortunate situation where either one or both of the funnels are scrapped or otherwise destroyed, recreations can be fitted to the vessel." Id.

Plaintiff's persistent bad faith and dilatory tactics are wholly improper and a gross abuse of this Court's finite resources. Despite Plaintiff's counsel's certification to the contrary, this action has been presented to the Court for the improper purpose of causing unnecessary delay, and based upon Plaintiff's own public statements, the factual contentions in Plaintiff's Amended Complaint lack evidentiary support— each in direct contravention of the proscriptions of Rule 11(b)(1) and (b)(4). Accordingly, this Court should sanction Plaintiff's counsel for filing and continuing to prosecute the Plaintiff's Amended Complaint in violation of Rule 11(b)(1).

## IV.   CONCLUSION

By affixing his signature to Plaintiff's Amended Complaint, Plaintiff's counsel certified, among other things, that (1) the pleading was not presented for any improper purpose, and that (2) the pleading's claims were warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law. See Fed. R. Civ. P. 11(b). As explained herein, that

30

certification was baseless. Plaintiff's filing of its amended pleading and continued prosecution of its frivolous claims constitutes a violation of Rule 11 and warrant sanctions against Plaintiff's counsel. Under Rule 11, counsel must make "an inquiry reasonable under the circumstances" before making representations to the Court. Id. Plaintiff's counsel failed to do so. Indeed, the County has done the research for Plaintiff and provided Plaintiff with the pertinent authorities refuting Plaintiff's assertions. Yet, Plaintiff proceeds in this action despite its claims against the County being unmoored from any legal theory.

While the County acknowledges that Plaintiff's individual members may harbor emotional attachment to the vessel, neither those affections nor the member's opinions of the County's planned use of the vessel amount to any cognizable legal claim for Plaintiff itself. Plaintiff's counsel knew or should have known there exists no legal basis for Plaintiff's claims against the County. Indeed, Plaintiff's pleading concedes the frivolity of Plaintiff's claims. A minimal amount of investigation by Plaintiff's counsel would have revealed that: (1) binding precedent in this Circuit precludes Plaintiff's standing arguments; and (2) the County possesses appropriate permitting to sink the vessel and create an artificial reef. Regardless, Plaintiff— through its counsel—continued to forge ahead in its baseless quest to delay the

inevitable. In the process, the County has incurred unnecessary attorneys' fees in defending against Plaintiff's groundless claims.

Accordingly, Plaintiff's counsel should be sanctioned for the filing and continued prosecution of Plaintiff's Amended Complaint (Doc. 12), and the County should be awarded both its attorneys' fees and costs, as well as any other relief this Court deems just and proper.

Respectfully submitted, this 19th day of August, 2025.

/s/ *Matthew R. Shaud*
ELMER C. IGNACIO
Florida Bar No. 537683
MATTHEW R. SHAUD
Florida Bar No. 122252
Nabors, Giblin & Nickerson, P.A.
1500 Mahan Drive, Suite 200
Tallahassee, Florida 32308
(850) 224-4070
(850) 224-4073 (Facsimile)
eignacio@ngnlaw.com
mshaud@ngnlaw.com
legal-admin@ngnlaw.com

**COUNSEL FOR DEFENDANT,**
**OKALOOSA COUNTY, FLORIDA**

## <u>CERTIFICATE REGARDING SAFE HARBOR PERIOD</u>

I HEREBY CERTIFY that, in accordance with the provisions of Federal Rule of Civil Procedure 11, a true and correct copy of the foregoing was electronically served on Plaintiff's counsel on May 23, 2025, but was not filed with the Court on that date.

/s/ *Matthew R. Shaud*
MATTHEW R. SHAUD

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed with the U.S. District Court, Northern District of Florida, via the CM/ECF system, which will also serve a copy to all counsel of record, on this 19th day of August, 2025.

/s/ *Matthew R. Shaud*
MATTHEW R. SHAUD

33

## **LOCAL RULE 7.1(B) CERTIFICATION**

Pursuant to Local Rule 7.1(B), undersigned counsel has conferred with counsel for Plaintiff via electronic mail on August 12 and August 18, 2025, about the relief requested herein. The parties do not agree on the resolution of this Motion, and both Plaintiff and Plaintiff's counsel oppose the sanctions requested herein.

More specifically, on Wednesday, August 6, 2025, this Court entered its Order dismissing Plaintiff's Amended Complaint (Doc. 28), and the Clerk entered judgment and closed the case the same day (Doc. 29).

On Tuesday, August 12th, undersigned counsel received client approval to file the instant Motion. Pursuant to Local Rule 7.1(B), undersigned counsel contacted Plaintiff's counsel on August 12th and requested both Plaintiff's and Plaintiff's counsel's position(s) on the relief requested herein. Plaintiff's counsel requested an extension until Monday, August 18th to provide objections, which undersigned counsel granted.

Having received no response, at 3:26PM ET on Monday, August 18th, undersigned counsel again contacted Plaintiff's counsel. Plaintiff's counsel responded at 4:36PM and stated, "We do object. I am putting the details into a more formal letter." Based upon that representation, at 5:19PM ET undersigned counsel

informed Plaintiff's counsel that the County would "temporarily hold off on filing the motion until tomorrow afternoon [*i.e.*, Tuesday, August 19th]."

At 5:50PM ET, Plaintiff filed its Notice of Voluntary Dismissal (Doc. 30), pursuant to Federal Rule of Civil Procedure 41(a)(1). Simultaneously at 5:50PM ET, Plaintiff's counsel emailed the undersigned a letter advising that Plaintiff would be dismissing its action with prejudice—seemingly in an attempt to preclude the County filing the instant Motion. The undersigned received electronic service of Plaintiff's filing (Doc. 30) at 5:51PM ET.

Notwithstanding Plaintiff's voluntary dismissal of an already-dismissed action, this post-judgment Rule 11 Motion is both authorized and timely. See Absolute Activist Value Master Fund, Ltd. v. Devine, 998 F.3d 1258, 1266 (11th Cir. 2021) ("[E]ven when a voluntary dismissal disposes of an entire action, district courts retain jurisdiction to consider at least five different types of collateral issues: costs, fees, contempt sanctions, Rule 11 sanctions, and motions to confirm arbitral awards. . . . Motions for costs, fees, and sanctions each implicate 'the power to enforce compliance with the rules and standards that keep the judiciary running smoothly.' Hyde v. Irish, 962 F.3d 1306, 1309 (11th Cir. 2020). If we divested the district court of jurisdiction over those motions, an enterprising plaintiff could abuse the judicial system but nevertheless get off scot free by voluntarily dismissing its

case under Rule 41(a)(1)(A)(i)."); see also <u>Willy v. Coastal Corp.</u>, 503 U.S. 131, 137–39 (1992) (sanctions under Rule 11 are a collateral issue, and a court may decide a Rule 11 motion even if it lacks jurisdiction over the underlying case); <u>Huggins v. Lueder, Larkin & Hunter, LLC</u>, 39 F.4th 1342, 1348 (11th Cir. 2022) ("If a party fulfills the safe harbor requirement by serving a Rule 11 sanctions motion at least 21 days before final judgment, then [the party] may file that motion after the judgment is entered.").

/s/ *Matthew R. Shaud*
MATTHEW R. SHAUD

## **LOCAL RULE 7.1(F) CERTIFICATION**

I HEREBY CERTIFY that this motion contains 7,484 words, excluding the case style and certifications.

/s/ *Matthew R. Shaud*
MATTHEW R. SHAUD